STATE OF NORTH CAROLINA v. NAVAS VILLABONA EVANGELISTA·

No. 441A84

(Filed 4 March 1987)

### 1. Homicide § 4.1— murder by starvation—dehydrated infant—evidence sufficient without specific intent to kill

In a murder prosecution arising from a three day siege by police of a train car during which an 8-month-old infant barricaded with defendant died of dehydration, it was noted that the evidence would have supported a conviction of defendant for first degree murder by means of starvation without proof of a specific intent to kill. N.C.G.S. 14-17.

### 2. Homicide § 21.5— premeditated murder—death of infant by dehydration—evidence sufficient

In a murder prosecution arising from the dehydration death of an infant during a three day period in which defendant was barricaded in a train car, the evidence was sufficient to show that defendant deprived the infant of liquids with the specific intent to kill where defendant repeatedly refused food and liquids for the children; he was asked by negotiators to release the children but refused; when the older child cried for water, defendant told her to be silent and that they were all going to die; negotiators warned defendant that the baby would dehydrate; defendant acknowledged that the older child was dehydrated and that the 8-month-old infant had little resistance; defendant was told the infant would not last without nourishment; defendant on several occasions responded that he would kill himself and the children if anyone attempted to come into the compartment; police told defendant they had water for the children, but defendant stated that he wanted matches first; and defendant refused attempts to pass an I.V. tube through a bullet hole into the compartment so that the children could receive nourishment.

### 3. Homicide § 21.5— first degree murder—identity of victims

The evidence in a murder prosecution was sufficient to prove that the bodies found inside a train compartment were the two victims alleged in the indictments where the indictments stated the names of the victims as Juan Ramirez and Maria Ramirez; medical examiners observed the bodies in the compartment, in body bags, in the ambulance, and performed autopsies in Chapel Hill; a woman named Maria Inez was introduced to a police investigator as being a member of the family of defendant and the victims who had come to identify the two bodies; and Mrs. Inez presented birth certificates stamped with the seal of Colombia, South America containing the names Isabella Novas Villabona Ramirez and Juan Fernando Ramirez; and Ms. Inez was given possession of the bodies.

### 4. Criminal Law § 17— murder on Amtrak train—not federal enclave—State jurisdiction proper

The State was not preempted from assuming jurisdiction of murders committed on an Amtrak train on the theory that the federal courts have ex-

State v. Evangelista

clusive jurisdiction because the train was part of a federal enclave where the act creating Amtrak expressly provided that it would not be an agency or establishment of the United States government.

**5. Homicide § 7— first degree murder—insanity defense—refusal to direct verdict for defendant—no error**

The trial court in a murder prosecution did not err by failing to direct verdicts of not guilty by reason of insanity where defendant presented strong evidence of insanity but the State presented evidence tending to controvert defendant's evidence and to support the presumption of defendant's sanity.

**6. Homicide § 7— murder—instruction on insanity defense—burden of proof—no error**

The trial court did not err in a prosecution for murder by instructing the jury that defendant had the burden of proving his insanity to the jury's satisfaction.

**7. Criminal Law § 50.1— murder—cocaine use—psychiatric and psychopharmacological expert—testimony admissible**

In a murder prosecution arising from the three day siege of defendant in an Amtrak car, the trial court did not err by introducing the testimony of an expert in psychology and psychopharmacology who made an analysis of tape recordings, reviewed psychological reports, interviewed witnesses and defendant, and concluded that defendant had used cocaine numerous times during the siege but that defendant's perception of real events was good and that the cocaine had not significantly interfered with his ability to respond. The trial court reasonably could have believed that the witness's experience and research placed him in a better position than the jury to determine whether defendant had used cocaine at the times in question and the effect of the cocaine on defendant's perceptions.

**8. Criminal Law § 138.23— aggravating factor—involuntary manslaughter—armed with firearm—error**

The trial court erred when sentencing defendant for involuntary manslaughter by finding as an aggravating factor that defendant was armed with a deadly weapon where, under the instruction of the court, the jury necessarily found that defendant was armed with and discharged a firearm. N.C.G.S. 15A-1340.4(a)(1).

**9. Criminal Law § 5.1— murder—insanity defense—last issue**

The trial court in a murder prosecution did not err by denying defendant's request that the jury be instructed to consider the issue of defendant's sanity before the issue of his guilt.

**10. Constitutional Law § 63— death qualified jury—constitutional**

The trial court did not err in a murder prosecution by death qualifying the jury.

APPEAL by the defendant from judgments entered by *Brewer, J.*, 29 February 1984, in Superior Court, WAKE County.

State v. Evangelista

The defendant was charged in separate indictments with two counts of first degree murder. He was convicted of first degree murder and involuntary manslaughter. He received sentences of life imprisonment and an additional eight years' imprisonment to run consecutively. The defendant appealed the murder conviction and resulting life sentence to the Supreme Court as a matter of right. His motion to bypass the Court of Appeals with regard to the involuntary manslaughter conviction was allowed on 5 December 1985. Heard in the Supreme Court on 10 December 1986.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State.*

*Gordon Widenhouse for the defendant appellant.*

MITCHELL, Justice.

The defendant brings forward numerous assignments of error. He contends: (1) the trial court erred by denying his motion to dismiss the charge of first degree murder of Juan Ramirez for insufficiency of the evidence to prove specific intent to kill; (2) the trial court erred in denying his motions to dismiss all charges for failure of the State to prove the identity of the victims; (3) the trial court lacked jurisdiction, because all pertinent acts were committed in a federal enclave; (4) the trial court erred in failing to direct verdicts of not guilty by reason of insanity; (5) the trial court violated the defendant's due process rights by instructing the jury that the defendant had the burden of proving his insanity to their satisfaction; (6) the trial court erred in allowing certain testimony based on psychopharmacology by a witness found to be an expert; (7) the trial court erred in finding as an aggravating factor to involuntary manslaughter that the defendant was armed with a deadly weapon, when that same evidence was necessary to prove an element of involuntary manslaughter; (8) the trial court erred in failing to find certain statutory mitigating factors supported by uncontradicted and credible evidence in sentencing the defendant for involuntary manslaughter; (9) the trial court erred in denying the defendant's request that the jury be instructed to consider the issue of his sanity before it considered his guilt; (10) the trial court erred in excusing for cause certain jurors who expressed an unwillingness to impose the death penalty, because the result was a jury prone to conviction.

We find no error in the defendant's trial for first degree murder or the resulting life sentence. We find merit, however, in the defendant's seventh assignment. Accordingly, we vacate his sentence for involuntary manslaughter and remand to the trial court for resentencing for that offense.

The State presented evidence which tended to show that on 8 October 1982, Amtrak train 82 which ran between Miami and New York arrived in Raleigh at 7:07 a.m. At that time, the baggage master went through the train to car 2475, a sleeper car, where he observed slivers of wood and a bullet on the floor. He saw bullet holes in the door to one of the compartments and heard someone inside speaking Spanish in a loud voice. He then summoned the conductor who had just come on duty. They went to the sleeper car where they heard a baby crying inside the compartment and the sound of breaking glass. Several passengers had also heard sounds from the compartment during the night, such as screaming, yelling, and the sound of shots being fired.

The police were called to the scene at 7:26 a.m. Railroad officials told the police that shots had been fired and that the compartment was occupied by a Spanish speaking man, his wife and two children. The occupants of the compartment were later identified as the defendant, his sister, and her children—an eight-month-old boy and three-year-old girl. Car 2475 and two adjacent cars were separated from the rest of the train. As a result of the cars being uncoupled, the electricity to them was cut off.

Police snipers and other law enforcement officers surrounded the car. After the remaining passengers had been removed, police searched the other compartments in the car including the compartment adjacent to the one occupied by the defendant. They were preparing to place a stethoscope against the partition dividing the two compartments in an attempt to hear any sounds emanating from the defendant's compartment when a shot was fired within. The officers immediately left the compartment as three more shots were fired in rapid succession. There were two other occasions in which gunfire in the defendant's compartment was heard.

For three days, until 10 October 1982, the defendant remained barricaded in the compartment as law enforcement officers attempted to negotiate with him. A Spanish speaking

negotiator spoke with the defendant directly using a "bull horn," first from a corridor around the corner from the defendant's compartment, then from a post outside after a window was removed from the car. The defendant's voice was transmitted to the police command post from a microphone that had been placed outside his compartment. His statements were translated and relayed through a "walkie-talkie" to the negotiators working with the police. Negotiators told the defendant that they were with the police and asked him repeatedly to come out, or at least release the children. He was offered food and liquids for himself and the children, but he refused. The defendant was warned many times about the safety of the children and told that they could not survive without food and water.

The defendant agreed to come out if police would contact his godfather in New York. As they awaited the arrival of the defendant's godfather, the defendant handed the little girl through the window of the train to Agent Romando Arras of the Federal Bureau of Investigation. Upon his godfather's arrival, the defendant came out of the train and was taken into custody.

When police entered the train, they found the bodies of a woman and an infant male. Expert testimony indicated that the woman had died from a bullet wound to the head, and the infant had died from dehydration.

The defendant relied upon a defense of insanity and presented evidence tending to show that during the entire siege, he suffered from paranoia. Several psychologists testified to the effect that the defendant was under the delusion that Colombian commandos were trying to kill him and his family. The defendant told them of his fear that these commandos had surrounded the train and had even infiltrated his compartment. The defendant also told them that he had remained on the top bunk in his compartment for days because he believed a commando was under the bottom bunk. He said that he refused food and water because he was afraid that it had been contaminated. He further claimed that the commandos killed his sister in the train compartment.

By his first assignment of error, the defendant contends that the trial court erred by denying his motion to dismiss the charge of first degree murder in the death of the infant, Juan Ramirez. He argues that the State failed to produce substantial evidence

that the defendant deprived the infant victim of liquids with the specific intent to cause his death. We do not agree.

In *State v. Brown*, 310 N.C. 563, 566, 313 S.E. 2d 585, 587 (1984) we again emphasized:

> [U]pon a motion to dismiss in a criminal action, all the evidence admitted, whether competent or incompetent, must be considered by the trial judge in the light most favorable to the State, giving the State the benefit of every reasonable inference that might be drawn therefrom. Any contradictions or discrepancies in the evidence are for resolution by the jury. . . . The trial judge must decide whether there is substantial evidence of each element of the offense charged. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

(Citations omitted.)

N.C.G.S. § 14-17 defines murder and provides in pertinent part that:

> A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or sex offense, robbery, kidnapping, burglary or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree. . . . All other kinds of murder . . . shall be deemed murder in the second degree. . . .

We have interpreted this statute as separating first degree murder into four distinct classes:

> (1) murder perpetrated by means of poison, lying in wait, imprisonment, starving or torture; (2) murder perpetrated by any other kind of willful, deliberate and premeditated killing; (3) murder committed in the perpetration or attempted perpetration of certain enumerated felonies; and (4) murder committed in the perpetration or attempted perpetration of any other felony committed or attempted with the use of a deadly weapon.

*State v. Johnson*, 317 N.C. 193, 202, 344 S.E. 2d 775, 781 (1986).

First degree murder most frequently has been defined as "the unlawful killing of a human being with malice and with premeditation and deliberation," and has included the element of a specific intent to kill. *State v. Johnson*, 317 N.C. at 202, 344 S.E. 2d at 781. However, it is also well established that proof of the elements of premeditation, deliberation and specific intent to kill is not necessary to sustain a first degree murder conviction based on the theory that the homicide was committed during the perpetration or attempted perpetration of a felony. *Id.* Likewise, we recently held that when a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving or torture, the presence or absence of premeditation, deliberation and specific intent to kill is irrelevant. *State v. Johnson*, 317 N.C. at 203, 344 S.E. 2d at 781.

[1] We note that the evidence in the present case would have supported conviction of the defendant for the first degree murder of the infant on the theory of murder perpetrated by means of starvation, specifically declared to be first degree murder by the statute. The evidence tended to show that the defendant deprived the infant male of liquids and thereby caused his death. Liquids are necessary in the nourishment of the human body, especially as here in the case of an infant. Therefore, deprivation of life-sustaining liquids amounts to starvation under the statute. If the trial court had submitted the case to the jury on the theory of starvation, it would *not* have been necessary that the State prove a specific intent to kill. As we said in *State v. Johnson*, "a specific intent to kill is . . . irrelevant when the homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture. . . ." *Id.*

[2] From an abundance of caution, however, the trial court sent the charge of first degree murder of the infant to the jury with instructions relating only to the theory of "murder perpetrated by any other kind of willful, deliberate and premeditated killing," the second category of first degree murder proscribed by the statute. Specific intent to kill is an element of first degree murder based on that theory. Therefore, the defendant is correct in arguing that to sustain his conviction on that theory, substantial evidence must have been introduced tending to show that he deprived the infant male of liquids with the specific intent to kill. We conclude that the evidence was sufficient in this regard.

The evidence tended to show the defendant was repeatedly offered both food and liquids for himself and the children, but he refused to accept them. He was also asked by negotiators to release the children but refused. When the older child cried for water, the defendant told her to be silent and that they were all going to die. Negotiators warned the defendant that the baby would dehydrate. The defendant acknowledged that the older child was dehydrated and that the eight-month-old infant had little resistance. The defendant was told that the infant could not last without nourishment. But on several occasions the defendant responded that if anyone attempted to come into the compartment, he would kill himself and the children. Police told the defendant that they had water for the children, but the defendant stated he wanted matches first. Further, when the police attempted to insert an "I.V." tube through a bullet hole in the compartment so that the children could receive nourishment, the defendant refused to look for the tube. He refused other attempts to pass the tube to him.

Viewing the evidence in the light most favorable to the State, there is sufficient evidence from which a reasonable mind might conclude that the defendant had the requisite specific intent to kill. We therefore overrule this assignment of error.

[3] The defendant next contends that the trial court erred in denying his motions to dismiss all charges for which he was tried, because the State failed to produce sufficient evidence that the bodies found inside the Amtrak compartment were the two victims alleged in the indictments. He complains that the State offered no evidence in this regard during its case-in-chief, and that the only evidence concerning the identity of the victims was improperly introduced during the State's rebuttal. We find this assignment of error is without merit.[1]

By introducing evidence at trial, the defendant waived his right to except to the denial of his motion to dismiss at the close of the State's evidence. *State v. Jones*, 296 N.C. 75, 77, 248 S.E. 2d 858, 859 (1978); N.C.G.S. § 15-173. The defendant's exception to

---

1. It is not necessary in this case to reach the broader issue of whether the State must include the name of a homicide victim in the indictment or prove the identity of the victim at all. *See generally*, N.C.G.S. § 15-144.

the denial of his motion to dismiss made at the close of all of the evidence, however, presents the issue of the sufficiency of *all of the evidence* to go to the jury. *Id.* Therefore, for purposes of reviewing this assignment of error, we consider all of the evidence introduced at trial and need not determine whether that evidence was competent.

The indictments stated the names of the victims as Juan Ramirez and Maria I. Ramirez. Dr. Laurin Kaasa, Wake County Chief Medical Examiner, testified that he was present during the search of the compartment that had been occupied by the defendant and observed the bodies of the deceased woman and infant male found therein. Dr. Kaasa also observed the body of the infant once it had been removed from the compartment and placed in a body bag in an ambulance. Dr. Robert Thompson, Associate Chief Medical Examiner for the State of North Carolina, testified that he saw the body of the deceased woman at the train station in a body bag and further observed the body as it was placed in an ambulance. He testified that the body was transported to Chapel Hill where he performed the autopsy. Dr. Paul Beddinger, also with the office of the Chief Medical Examiner for the State, testified that he observed the body of the infant male at the train station. He saw the body as it was placed in an ambulance bound for Chapel Hill where he performed the autopsy.

J. C. Holder, an investigator with the Raleigh Police Department, testified that he interviewed a woman named Maria Inez, who was introduced to him as being a member of the family of the defendant and the victims. She had come to the medical examiner's office in Chapel Hill to identify the two bodies that were removed from the train compartment. She presented birth certificates stamped with the seal of Colombia, South America containing the names of Isabella Navas Villabona Ramirez and Juan Fernando Ramirez, and was given possession of the bodies. Viewing this evidence and all other evidence introduced in the light most favorable to the State and giving it all reasonable inferences favorable to the State, we conclude that there was substantial evidence tending to show that the bodies removed from the compartment were those of the victims named in the indictments.

[4] By his next assignment of error, the defendant contends that the assumption of jurisdiction by the trial court in this criminal

action was erroneous. He argues that the offenses charged were committed in an Amtrak passenger train, and that the federal courts have exclusive jurisdiction because the train was part of a "federal enclave." We find this argument unpersuasive.

The Rail Passenger Service Act of 1970, which created Amtrak, expressly provides that: "The Corporation will not be an agency or establishment of the United States Government." 45 U.S.C. § 541 (1981 and Supp. 1986). Since Amtrak is not a federal agency or establishment, but is a private corporation operated for profit, we do not believe that its tracks or cars are parts of a "federal enclave." Therefore, we conclude that the State is not preempted from exercising its police power in the present case. *See, e.g., National Railroad Passenger Corporation v. Miller*, 358 F. Supp. 1321 (D. Kan.), *affirmed*, 414 U.S. 948, 38 L.Ed. 2d 205 (1973). This assignment of error is overruled.

[5] By his next assignment of error, the defendant contends that the trial court erred in failing to direct verdicts of not guilty by reason of insanity. He argues that he was entitled to such directed verdicts as a matter of law because he produced overwhelming, uncontroverted evidence of his insanity from a number of expert and lay witnesses. We do not agree.

The test of insanity as a defense to a criminal charge is whether the defendant was laboring under such a defect of reason from disease or deficiency of mind at the time of the alleged act as to be incapable of knowing the nature and quality of his act or, if he did know this, was incapable of distinguishing between right and wrong in relation to such act. *State v. Corley*, 310 N.C. 40, 53, 311 S.E. 2d 540, 548 (1984); *State v. Vickers*, 306 N.C. 90, 94, 291 S.E. 2d 599, 603 (1982). This test is known as the M'Naghten Rule.

Every person is presumed sane until the contrary is shown, and the defendant has the burden of proving his insanity. *State v. Mize*, 315 N.C. 285, 289, 337 S.E. 2d 562, 565 (1985). However, unlike the State which must prove the defendant's guilt beyond a reasonable doubt, the defendant is merely required to prove his insanity to the satisfaction of the jury. *Id.*

On a motion for a directed verdict of not guilty by reason of insanity, the evidence for the State is taken as true with conflicts and discrepancies therein resolved in the State's favor, giving the

State the benefit of every reasonable inference which may be drawn from the evidence. *State v. Mize*, 315 N.C. at 290, 337 S.E. 2d at 565. All the evidence admitted, whether competent or incompetent, which is favorable to the State is considered by the Court in ruling upon the motion. *Id.* Further, in considering whether a trial court has erred in refusing to direct a verdict of not guilty by reason of insanity, we must bear in mind the rule that "in all cases there is a presumption of sanity, and when there is other evidence to support this presumption, this is sufficient to rebut defendant's evidence of insanity. . . ." *Id.* (quoting *State v. Harris*, 290 N.C. 718, 726, 228 S.E. 2d 424, 430 (1976)).

Testimony regarding mental capacity is not confined to expert witnesses alone.[2] *State v. Hammonds*, 290 N.C. 1, 5, 224 S.E. 2d 595, 598 (1976). Anyone who has had a reasonable opportunity to form an opinion is permitted to give his opinion upon the issue of mental capacity. *Id.* at 5-6, 224 S.E. 2d at 598.

In the present case, the defendant indeed presented strong evidence that he was insane when he shot Maria Ramirez and when he deprived Juan Ramirez of liquids. The defendant introduced extensive testimony by expert witnesses that his paranoia affected his actions, and that he was incapable of knowing right from wrong in relation to the acts charged.

However, the record reveals that the State presented evidence tending to controvert the defendant's evidence and to support the presumption of his sanity. Chief Frederick Heineman of the Raleigh Police Department testified that from his observations of the defendant throughout the seige, he was of the opinion that the defendant was in control of his situation and knew that what he was doing was wrong. Further, three agents of the Federal Bureau of Investigation who observed the defendant at the time of the offenses charged testified that they were of the opinion that he knew the difference between right and wrong. Agent Arras, who speaks Spanish and was the principal negotiator, also testified that when the defendant asked police to contact his god-

2. The trial of the present case was completed prior to 1 July 1984, the effective date of The North Carolina Rules of Evidence, N.C.G.S. ch. 8C, and those rules did not apply at trial. *State v. Freeman*, 313 N.C. 539, 330 S.E. 2d 465 (1985). Therefore, all evidentiary issues raised by the defendant on this appeal are controlled by the law of evidence in effect prior to 1 July 1984.

father, he was rational in giving the correct telephone number and correctly spelling the name.

We conclude that the defendant's evidence of insanity was neither uncontroverted nor overwhelming. Therefore, we overrule this assignment of error.

[6] The defendant additionally assigns as error the trial court's instruction to the jury that the defendant had the burden of proving his insanity to the jury's satisfaction. He argues that this instruction was contrary to principles of due process, because it relieved the State of its burden of establishing that he acted with the requisite *mens rea* when committing the acts charged. We have recently rejected an identical argument. *E.g., State v. Mize*, 315 N.C. at 293-94, 337 S.E. 2d at 567. We again decline to change our rule, and hold that the trial court did not err in its instructions to the jury in this regard.

[7] The defendant next assigns as error the admission of certain expert testimony of Dr. Ronald Siegel. Dr. Siegel was qualified as an expert in the fields of psychology and psychopharmacology.[3] He testified that he made an analysis of the tape recordings of the siege, reviewed psychological reports and interviewed witnesses and the defendant to determine the defendant's responses to different events and interpret the words and statements made by the defendant. Dr. Siegel concluded that the defendant used cocaine numerous times during the siege of the train. But he also concluded that the defendant's perception of the real events was good and the cocaine did not significantly interfere with his ability to respond. The defendant contends such testimony was erroneously allowed because it went beyond the scope of Dr. Siegel's field of expertise and was not based on a technique generally accepted in the scientific community.

Expert testimony is properly admissible when it can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences. *State v. Bullard*, 312 N.C. 129, 139, 322 S.E. 2d 370, 376 (1984); *Cogdill v. Highway Commission*, 279 N.C. 313, 182 S.E. 2d 373 (1971). It is not necessary that an expert be experienced with the identical

---

3. Psychopharmacology is the study of the effect of drugs on the mind and behavior.

subject matter at issue or be a specialist, licensed, or even engaged in a specific profession. *State v. Bullard,* 312 N.C. at 140, 322 S.E. 2d at 376; *State v. Phifer,* 290 N.C. 203, 225 S.E. 2d 786 (1976), *cert. denied,* 429 U.S. 1123, 51 L.Ed. 2d 573 (1977). This Court has not adhered exclusively to the view that expert testimony must be based upon "generally accepted" scientific methods. *See generally, State v. Bullard,* 312 N.C. 129, 322 S.E. 2d 370. It is enough that the expert witness "because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson,* 295 N.C. 559, 569, 247 S.E. 2d 905, 911 (1978). Further, "the trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony." *State v. Bullard,* 312 N.C. at 140, 322 S.E. 2d at 376.

The record indicates that Dr. Siegel holds a Ph.D. in psychology and has conducted numerous studies and published numerous books and articles on the subjects of psychology, psychopharmacology and the effects of cocaine. He has taught courses in psychology and courses in the general area of drugs and behavior at The University of California at Los Angeles. He spent hundreds of hours listening to the tapes in the present case to distinguish sounds such as nasal sounds made by the defendant that would indicate he was using cocaine. Through his investigations he attempted to discover what occurred within the compartment during the days of the siege, so that he could give a professional opinion about the defendant's mental condition at that time.

The trial court reasonably could have believed that Dr. Siegel's experience and research placed him in a better position than the jury to determine whether the defendant had used cocaine at the times in question and the effect any such cocaine had on the defendant's perceptions. Therefore, we conclude that the trial court did not abuse its discretion by admitting the challenged testimony of Dr. Siegel. This assignment is overruled.

[8] The defendant next contends that the trial court erred in finding as a factor aggravating the involuntary manslaughter conviction that the defendant was armed with a deadly weapon. The defendant relies on N.C.G.S. § 15A-1340.4(a)(1), which provides that "[e]vidence necessary to prove an element of the offense may

not be used to prove any factor in aggravation . . . ." The defendant argues that proof of the unlawful killing element of involuntary manslaughter rested upon the evidence that the defendant shot and killed Maria Ramirez with a firearm, a deadly weapon. Therefore, the same evidence could not be used to support this aggravating factor. We agree with the defendant's argument.

Involuntary manslaughter is the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony or naturally dangerous to human life, or (2) a culpably negligent act or omission. *State v. McGill*, 314 N.C. 633, 637, 336 S.E. 2d 90, 92 (1985). Accordingly, the trial court instructed the jury as follows:

> For you to find that this defendant is guilty of involuntary manslaughter the State must prove two things beyond a reasonable doubt.
>
> First, that the defendant acted in a criminally negligent way, as I have previously defined that term to you, in discharging a firearm in a train compartment.
>
> Again, the general instructions concerning criminal negligence which I gave earlier would apply here.
>
> Second, the State must prove that this criminally negligent act of discharging a firearm in a train compartment proximately caused Maria Ramirez's death.

For the jury to convict the defendant of involuntary manslaughter under this instruction by the trial court, it necessarily found that the defendant was armed with and discharged a firearm. Therefore, the possession and discharge of the firearm in effect became an element of the offense, and the same evidence could not be considered as a factor aggravating the manslaughter for sentencing. *See State v. Blackwelder*, 309 N.C. 410, 306 S.E. 2d 783 (1983). We hold that the defendant must be given a new sentencing hearing on his conviction for involuntary manslaughter.

The defendant next assigns as error the trial court's failure to find certain statutory mitigating factors with regard to his conviction for involuntary manslaughter. As we have held that the defendant must receive a new sentencing hearing on his convic-

tion for that offense, it is unnecessary for us to consider the merits of this assignment of error. At the new sentencing hearing, the defendant may again present evidence and argue in support of his view that the statutory factors apply.

[9]   The defendant also contends that the trial court erred in denying his request that the jury be instructed to consider the issue of his sanity before the issue of his guilt. We have followed the rule "that the jury should establish defendant's guilt or innocence of the crime first and reach the insanity issue only if it first found defendant guilty of the crime." *State v. Boone*, 302 N.C. 561, 568, 276 S.E. 2d 354, 359 (1981). We decline to change our rule, and hold that the trial court did not err in this regard.

[10]   Finally, the defendant contends that the trial court erred in excusing for cause certain jurors who were unwilling to impose the death penalty. He argues that this process of "death qualification" violated his constitutional rights to due process and to a fair and representative jury from the community, because it resulted in a jury that was biased in favor of the prosecution. This assignment of error is without merit and is overruled. *Lockhart v. McCree*, --- U.S. ---, 90 L.Ed. 2d 137 (1986); *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986); *State v. Johnson*, 317 N.C. 193, 200, 344 S.E. 2d 775, 779-80 (1986).

We hold that the defendant's trial and sentencing for first degree murder were without prejudicial error. Error in the sentencing of the defendant for involuntary manslaughter, however, requires that this action be remanded to the Superior Court, Wake County, for a new sentencing hearing on the defendant's conviction for involuntary manslaughter.

In Case No. 82CRS61201—First degree murder—no error.

In Case No. 82CRS61199—Involuntary manslaughter—remanded for new sentencing hearing.