STATE OF NORTH CAROLINA v. JEREMY BRIAN JENNINGS, Defendant

No. COA10-503

(Filed 18 January 2011)

## 1. Evidence— physician's testimony—explanation of lack of physical evidence

There was no plain error in a prosecution for statutory rape and related offenses in a physician testifying that it was probable that a tear in the victim's hymen would have healed by the time she saw the victim. This was not an impermissible opinion about the victim's credibility, but an explanation of the lack of physical

findings indicating sexual abuse. Moreover, the evidence against defendant was overwhelming.

**2. Evidence— forensic computer expert—disposal of evidence**

There was no plain error in a prosecution for statutory rape and related offenses in allowing the State's forensic computer expert, who had found nothing illicit in his examination of defendant's computer equipment, to answer hypothetical questions about disposing of or hiding evidence. The testimony was in the scope of his expertise and did not invade the province of the jury. Moreover, the evidence of defendant's guilt was overwhelming.

Appeal by defendant from judgments entered 8 October 2009 by Judge Tanya T. Wallace in Cabarrus County Superior Court. Heard in the Court of Appeals 27 October 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Jacqueline M. Perez, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Emily H. Davis, for defendant-appellant.*

HUNTER, Robert C., Judge.

Defendant Jeremy Brian Jennings appeals his convictions of three counts of statutory rape, two counts of statutory sex offense, and one count of taking indecent liberties with a minor. After careful review, we find no error.

Facts

The State's evidence at trial tended to establish the following facts: In the summer of 2006, A.S. ("Anna") was 14 years old and living with her mother and older sister in Cabarrus County.[1] Defendant, who was 28 at the time, and his wife were neighbors and Anna would see them out in the neighborhood a couple of times a week. Anna's family was having problems with their computer and asked defendant, who had some computer skills, if he would try to fix it. Defendant took the computer to his house, fixed the problem, and returned it to Anna's house.

---

1. The pseudonym "Anna" is used throughout this opinion to protect the minor's privacy and for ease of reading.

Later, while Anna was doing homework one night, she received an instant message on the computer from defendant, although she had not given defendant her "screen name." Defendant told Anna that he had liked her "for a while" and asked her to call him that night. When Anna called defendant, she thought it was "weird" because he was an "older guy." After talking for a while, defendant began describing "sexual favors" he wanted Anna to do to him.

Defendant and Anna began instant messaging or talking on the telephone almost every day and defendant would tell Anna that he loved her, that he wanted her to perform oral sex on him, and that he wanted to have sex with her. One night in January 2007, Anna snuck out of her window after midnight and met defendant at a gas station near her house. Anna got into defendant's car and he drove to a cul-de-sac and parked. Anna sat on defendant's lap and they kissed "with tongue." After about an hour and a half, defendant thought it was getting late and took Anna back home.

Sometime after 1 February 2007 but before Anna's 15th birthday (March 2007), defendant told Anna that he was "going to Iraq" and that she would not see him again. That night, Anna snuck out of her house late at night and met defendant at the gas station. Defendant drove Anna to his mother's house in Harrisburg, where he was then living. After watching television in defendant's room for a while, defendant took off his shirt and Anna's and started kissing her. Defendant then asked her to "give him oral sex." Defendant took his pants off and Anna performed oral sex on him. Defendant next took off Anna's pants and inserted his tongue and his fingers into her vagina. Defendant then made Anna get on her hands and knees and had sex with her. Afterward, Anna was bleeding and defendant gave Anna a towel to wipe off the blood. Defendant and Anna got dressed and defendant drove her home.

After that night, defendant and Anna continued to instant message and talk on the telephone. Defendant also set up a page on the social networking site MySpace for them to communicate. Defendant labeled the page "Pomp Daddy" as a reference to a instance when Anna and defendant were instant messaging and Anna accidentally called defendant "Pomp Daddy" when she intended to type "Pimp Daddy."

Defendant told Anna that he wanted to have sex with her again. Sometime after Anna's birthday in March 2007, they met again at the gas station late at night. Defendant was driving a black Chevrolet

Tahoe that belonged to his boss, Daniel Phillips. They drove to a construction site, where they parked and kissed for a while. Defendant eventually asked Anna if she wanted to move to the backseat. Defendant put the backseats down and spread out a blanket for them to lie on. Defendant and Anna took off their clothes, performed oral sex on each other, and began having sex. During intercourse, defendant took a photograph of his penis inserted in Anna's vagina and one of her "vaginal area." Afterward, defendant and Anna got dressed and he drove her home.

Sometime around June 2007, Anna met defendant and they drove in defendant's boss's black SUV to the same construction site. They got into the backseat of the SUV, performed oral sex on each other, and engaged in sexual intercourse.

During the period in which defendant had access to his boss's black Tahoe, Phillips noticed that often when defendant returned the vehicle, the backseats would be folded down and that there would a blanket or a pillow in the back. On one occasion, while driving to a work site with defendant, Phillips overheard him having a cell phone conversation in which he described doing certain sexual acts with the other person on the phone. After arriving at the job site, instead of getting off the phone to begin working, defendant put the phone on speaker phone so that both he and Phillips could hear the conversation. Phillips was "shocked" when he heard a "young girl['s]" voice on the phone. Phillips, a longtime friend of Anna's mother's boyfriend, recognized Anna's voice and asked defendant if Anna was the girl on the phone. Defendant did not answer the question but had a "grin on his face like a Cheshire cat." Defendant later admitted that he was having a "relationship" with Anna and Phillips told him that he needed to end the relationship.

Defendant stopped communicating with Anna in May 2007, after meeting Jamie Cagle. When defendant stopped responding to her instant messages, texts, and posts on MySpace, Anna eventually called defendant. Defendant handed the phone to Cagle, who told Anna that she was defendant's girlfriend.

On 25 October 2007, Anna was seen by Doctor Carla Jones, complaining of painful urination. When asked by Dr. Jones, Anna denied being sexually active because she did not want to get defendant in trouble. Based on her symptoms and reported history, Anna was diagnosed as having a bladder infection. When the condition recurred in May 2008, Anna became concerned that she had a sexually

transmitted disease and told her mother that she had sex with defendant. Anna's mother immediately took her to the Child Advocacy Center, where Dr. Jones conducted a sexual abuse examination. Anna was diagnosed as having bacterial vaginitis, but the physical examination was normal.

Defendant was charged with three counts of statutory rape, two counts of statutory sex offense, and one count of taking indecent liberties with minor. Defendant pled not guilty and the case proceeded to trial, where the jury convicted defendant of all charges. The trial court consolidated the indecent liberties charge with one count of statutory rape and sentenced defendant to a presumptive-range term of 240 to 297 months imprisonment. The trial court also consolidated the two remaining statutory rape charges with the two statutory sex offense convictions and sentenced defendant to a consecutive presumptive-range term of 230 to 285 months imprisonment. Defendant gave oral notice of appeal in open court.

## Standard of Review

Defendant's arguments on appeal are limited to challenging the admission of certain expert testimony by Dr. Jones, the physician that performed Anna's sex abuse examination, and by Sergeant Brian Shiele, the police officer, qualified in computer forensics, who examined defendant's computer. As defendant did not object to either witness' testimony, defendant's contention regarding the admissibility of the experts' testimony is reviewed for plain error. *See State v. Goforth*, 170 N.C. App. 584, 589, 614 S.E.2d 313, 316 (reviewing admission of expert testimony for plain error where "[d]efendant neither objected to nor moved to strike th[e] testimony"), *cert. denied*, 359 N.C. 854, 619 S.E.2d 854 (2005). Under plain error analysis, the defendant bears the burden of demonstrating "not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

I

[1] With respect to Dr. Jones, she was qualified—without objection from defendant—as an expert in family medicine. She testified on direct-examination about the healing process of the vaginal orifice. Using a "hair scrunchie," Dr. Jones illustrated how the vaginal opening in mature females stretches and retracts after they begin "making estrogen." Dr. Jones also showed the jury a time-lapse

photographic display of an "obvious [hymen] tear" healing over a four month period to the extent that the tear is no longer visible. Based on her illustrations, Dr. Jones explained that if she performed an initial examination of a child four months after an alleged incident of sexual abuse, she would be unable to conclude "one way or the other" as to whether the child had been sexually abused. The prosecutor then asked Dr. Jones about her examination of Anna:

> Q. Dr. Jones, when [Anna] presents to your office, it is one year after this event.
>
> A. Yes.
>
> Q. Is it possible that she could have had a tear or some of these items that you just pointed out, but by the time you get her a year later, it could be gone?
>
> A. More than possible, probable.
>
> Q. Is it also possible because she was estrogenized like you talked about with the scrunchie that there wasn't any injuries at all to begin with?
>
> A. It is possible.
>
> Q. That he just didn't cause any [injury] when he—if—if he engaged in sexual activity with her?
>
> A. It's possible.

Defendant contends that "Dr. Jones' opinion that it was 'probable' there had been a tear in [Anna]'s hymen was inadmissible expert testimony as it lacked sufficient foundation and constituted impermissible opinion on the credibility of the prosecuting witness." *See generally State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) (per curiam) ("In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has in fact occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility." (emphasis ommitted)).

We read Dr. Jones' testimony differently than defendant. Viewed in context of her explanation regarding the time frame for the healing of a hymen tear, Dr. Jones testified, not that "it was 'probable' that there had been a tear in [Anna]'s hymen," as defendant suggests, but, rather, that *if there had been a tear* in Anna's hymen as a result of sexual activity with defendant, the tear "probabl[y]" would have

healed by the time she saw Anna, roughly a year after the last alleged incident of sexual abuse. The State's purpose in presenting Dr. Jones' testimony was to explain to the jury that the lack of physical findings indicative of sexual abuse did not necessarily establish that Anna was not sexually abused by defendant. This type of testimony is not an impermissible opinion regarding the complainant's credibility. The trial court, therefore, did not err, much less commit plain error, in admitting Dr. Jones' testimony.

Even assuming error, however, defendant cannot demonstrate prejudice resulting from the admission of Dr. Jones' testimony. At trial, Anna testified in explicit detail about defendant's kissing her, his performing cunnilingus on Anna at his mother's house, and his forcing Anna to have sex with him once at his mother's house and twice at a construction site. In addition to Anna's testimony, Mr. Phillips, defendant's boss, testified about overhearing a cell phone conversation between defendant and another person in which defendant discussed engaging in sexual acts with that person. Defendant later told Mr. Phillips that Anna was the other person on the phone and that he was having a "relationship" with her. The State also presented evidence that, in addition to Anna, defendant's ex-wife and girlfriend were both diagnosed with bacterial vaginitis, a bacteria that, according to Dr. Jones, may be sexually transmitted. Given this overwhelming evidence, we cannot conclude that, had Dr. Jones' testimony not been admitted, the jury probably would have reached a different result at trial. *See id.* at 267, 559 S.E.2d at 789 ("The overwhelming evidence against defendant leads us to conclude that the error committed did not cause the jury to reach a different verdict than it otherwise would have reached. Accordingly, although the trial court's admission of the challenged portion of Dr. Prakash's testimony was error, it did not rise to the level of plain error."); *State v. Brigman,* 178 N.C. App. 78, 91-92, 632 S.E.2d 498, 507 (holding error in admission of expert opinion that " 'children suffered sexual abuse by [defendant]' " did not constitute plain error due to "overwhelming" evidence of defendant's guilt: children "described details of the abuse and identified defendant as their abuser" and defendant's claims to have sexually abused the children were corroborated by inmate), *appeal dismissed and disc. review denied,* 360 N.C. 650, 636 S.E.2d 813 (2006).

II

[2] Defendant also contends that the trial court committed plain error by admitting the expert testimony of Sergeant Schiele. After being

accepted by the trial court as an expert in forensic computer examination, Sergeant Schiele testified that, based on the initial complaint and witness interviews, the police department obtained and executed a search warrant for defendant's residence, "looking for computer equipment, peripheral devices, [such as] scanners, printers, [and] keyboards," as well as "cameras, memory cards for cameras, digital versatile disks, compact disks, floppy disks, pretty much anything computer-related . . . ." He then stated that, although he was unable to examine two computer hard drives because there was "something physically wrong" with one of the drives and the other had been "wiped clean," he had been able to examine five other hard drives, four camera memory cards, and numerous compact discs. Sergeant Schiele reported that he found "nothing illicit," such as "sexually illicit photos or any correspondence between [defendant] and the victim."

The prosecutor then asked Sergeant Schiele a series of four hypothetical questions, which, although not objected to at trial, now form the basis of defendant's argument on appeal:

Q. Sergeant Schiele, based on your training and experience, do those who have proof of criminal activity on a computer, do they make attempts to hide it?

A. Some will make attempts to hide it; yes.

. . . .

Q. Based on your training and experience, someone conducting an illegal relationship, [do] you think they would hit "save" to save that conversation?

A. No.

. . . .

Q. Based on your training and experience, was [defendant] given enough time if, hypothetically, he wanted to dispose of things, would that have been enough time to dispose of it?

A. Yes.

. . . .

Q. Based on your experience and training, would someone who set up a site for a young girl put their real statistics for law enforcement to find?

A. No.

Defendant argues that Sergeant Schiele's testimony is "inadmissible expert testimony as it was not based on his expertise in computer forensics, was not helpful to the jury, and constituted impermissible opinion as to [defendant]'s guilt."

Rule 702 of the Rules of Evidence governs the admissibility of expert testimony, providing in pertinent part: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C. R. Evid. 702(a); *State v. Chandler*, 364 N.C. 313, 316, 697 S.E.2d 327, 329-30 (2010). Thus, expert testimony is admissible under Rule 702 "when it can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences." *State v. Evangelista*, 319 N.C. 152, 163, 353 S.E.2d 375, 383 (1987). Although the trial court "should avoid unduly influencing the jury's ability to draw its own inferences, expert testimony is proper in most facets of human knowledge or experience." *State v. Brockett*, 185 N.C. App. 18, 28, 647 S.E.2d 628, 636, *disc. review denied*, 361 N.C. 697, 654 S.E.2d 483 (2007).

As one appellate court has explained, "[i]t is common . . . for experts to testify in criminal cases about the *modus operandi* of certain types of criminal offenders [and] [c]ourts generally permit such expert testimony because jurors cannot be presumed to have knowledge of these matters, and it therefore may help the jury understand and evaluate the evidence." *Jones v. United States*, 990 A.2d 970, 978 (D.C. 2010). Pertinent here, this Court has held that law enforcement officers may properly testify as experts about the practices criminals use in concealing their identity or criminal activity. *See State v. Alderson*, 173 N.C. App. 344, 350-51, 618 S.E.2d 844, 848-49 (2005) (holding trial court properly permitted SBI agent to "give her opinion as to why the seizure of defendant's police frequency book was important, testifying that finding a police frequency book and a radio scanner can indicate those acting illegally may have a 'jump-start' if they know which police frequencies to monitor."); *State v. White*, 154 N.C. App. 598, 604, 572 S.E.2d 825, 830-31 (2002) ("Lieutenant Wood had 'training, and various courses and experience in working certain cases which led him to conclude that 'there are times that the significance of an object such as a pillow or a cloth being placed over somebody's face can mean in a case that the perpetrator knew the victim and did not want to see their face or have

their face appear either before, during, or after the crime.' Since Lieutenant Wood testified in the form of an opinion based on his expertise, and the testimony was likely to assist the jury making an inference from the circumstances of the crime, the trial court properly admitted the testimony.").

Prior to being admitted as an expert in computer forensics, Sergeant Schiele described his specialized training and experience, which included, among other things, training in computer hardware fundamentals, computer forensics, advance data recovery and analysis, computer network forensics, and cell phone forensics. He also indicated that he had performed "probably around a hundred exams." Consequently, because of his training and experience in computer forensics, Sergeant Schiele was "in a better position to have an opinion on the subject than [wa]s the trier of fact." *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978).

Defendant nonetheless contends that Sergeant Schiele's testimony impermissibly exceeded the scope of his expertise in computer forensic examination because he found "nothing incriminating." Similar to Dr. Jones' testimony, the State elicited the challenged testimony from Sergeant Schiele to explain why, despite Anna's testifying that she and defendant routinely communicated through instant messaging and their MySpace web page and that defendant took digital photographs of her vaginal area during sex, no evidence of these communications or photographs were recovered from defendant's computer equipment, camera, or storage devices. As Sergeant Schiele's expertise included training in areas such as "advance data recovery and analysis," "cyber crime investigation," and "on-line crime scene investigation," his testimony addressing how a person might hide or destroy incriminating information on a computer or provide false personal information in order to avoid detection was within the scope of his expertise.

Defendant also argues that Sergeant Schiele's testimony "constituted [an] improper opinion on [defendant's] guilt." While defendant is correct that "law enforcement officers [should not be permitted] to provide their opinions regarding [a] defendant's guilt," *State v. Carrillo*, 164 N.C. App. 204, 211, 595 S.E.2d 219, 224 (2004), *appeal dismissed and disc. review denied*, 359 N.C. 283, 610 S.E.2d 710 (2005), Sergeant Schiele's testimony did not "impermissibly invade[] the province of the jury" by "dr[awing] an inference about the defendant's guilt" from the evidence, *State v. Owens*, N.C. App. ——, ——, 695

S.E.2d 823, 826 (concluding detective's testimony that police "considered" tools found on defendant to be "house breaking tools" was not an expression of opinion as to defendant's guilt), *cert. denied,* —— N.C. ——, —— S.E.2d —— (2010).

In any event, assuming that the trial court erred in admitting the challenged portions of Sergeant Schiele's testimony, defendant has failed to demonstrate that "the jury would probably have reached a different verdict if this testimony had not been admitted." *State v. Hammett,* 361 N.C. 92, 98, 637 S.E.2d 518, 522 (2006). As we concluded in addressing Dr. Jones' testimony, the State presented overwhelming evidence of defendant's guilt in the form of Anna's detailed description of the sexual acts committed by defendant, defendant's boss' testimony concerning the cell phone conversation between defendant and Anna in which defendant described performing sexual acts with her and defendant's admission to having a relationship with Anna, as well as evidence that Anna, defendant's ex-wife, and his girlfriend were all diagnosed with the same sexually transmitted bacterial infection.

In addition to that evidence, Sergeant Schiele testified that the subscriber information for the "Pomp Daddy" MySpace web page indicated that the account was created by someone with the email address "hondacrzy@yahoo.com." On cross-examination, defendant admitted to creating hondacrzy@yahoo.com as his personal email account. Defendant's admission corroborates Anna's testimony that she and defendant communicated during their "relationship" through the use of a MySpace web page created by defendant. Thus, assuming that the trial court erred in admitting Sergeant Schiele's answers to the prosecutor's hypothetical questions, we conclude that the error did not have a probable impact on the jury's verdict.

No Error.

Judges CALABRIA and GEER concur.