IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-884

 Filed: 1 October 2019

Gaston County, No. 15 CRS 62458; 17 CRS 845

STATE OF NORTH CAROLINA

 v.

THOMAS ALLEN CHEEKS

 Appeal by defendant from judgment entered 1 November 2017 by Judge Hugh

B. Lewis in Superior Court, Gaston County. Heard in the Court of Appeals 24 April

2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Derrick
 C. Mertz, for the State.

 Appellate Defender G. Glenn Gerding, by Assistant Appellate Defender Daniel
 Shatz, for defendant-appellant.

 STROUD, Judge.

 Defendant appeals from his conviction following a bench trial for first degree

murder by starvation under North Carolina General Statute § 14-17(a) and negligent

child abuse under North Carolina General Statute § 14-318.4(a4), both arising from

the mistreatment and death of his four-year-old stepson, Malachi Golden. There was

sufficient competent evidence to support the trial court’s conclusion that defendant

intentionally starved his four-year-old stepson Malachi and that starvation was the

proximate cause of his death. As to his conviction for negligent child abuse, there
 STATE V. CHEEKS

 Opinion of the Court

was no fatal variance between the evidence presented at trial and the indictment.

After careful review of Defendant’s arguments and all of the evidence, we find no

error in the trial court’s judgment.

 I. Procedural and Factual Background

 Defendant Thomas Allen Cheeks was charged with first degree murder,

negligent child abuse resulting in serious injury, and intentional child abuse

resulting in serious injury, all arising from the death of Malachi Golden. He waived

jury trial, and a five-day bench trial was conducted starting on 23 October 2017 before

the Superior Court, Gaston County. On 1 November 2017, the trial court entered

verdicts finding defendant not guilty of intentional child abuse, guilty of negligent

child abuse, and guilty of first degree murder by starving but not guilty of murder

“with premeditation and deliberation where a deadly weapon is used,” felony murder,

or murder by torture.1 Defendant was sentenced to life imprisonment without parole.

Defendant gave notice of appeal in open court.

 The evidence showed that Malachi Golden was born on 15 November 2010. At

the time of his death, Malachi lived with his mother, Tiffany Cheeks, his stepfather,

Defendant, and his two younger half-sisters, both the biological children of Mrs.

Cheeks and Defendant. Malachi’s biological father was never involved in his life. His

1Based upon its verdict of first degree murder by starving, the trial court noted that second degree
murder was moot.

 -2-
 STATE V. CHEEKS

 Opinion of the Court

mother began living with Defendant in 2012, and they were married on 1 November

2013.

 Malachi began having “infantile spasms” when he was about 4 months old, and

Mrs. Cheeks took him to see his pediatrician, who referred Malachi to a pediatric

neurologist, Dr. Robinett. Dr. Robinett determined he was suffering from seizures

and prescribed an anti-epileptic medication, Zonisamide. Upon further testing,

physicians determined Malachi had a chromosomal abnormality, a microdeletion in

chromosome 22. They recommended additional testing to determine whether the

abnormality was inherited and likely insignificant, or a new mutation that may be

clinically significant, but Mrs. Cheeks never returned to have additional testing done.

Mrs. Cheeks stopped taking Malachi to the pediatric neurologist in June 2013, one

month after her first child with Defendant was born. Sometime in 2014, without

consulting a physician, Mrs. Cheeks stopped giving Malachi his medication.

 Malachi had trouble walking and was referred to the Child Development

Services Agency (CDSA), which began therapy services. With therapy, his fine motor

skills improved, his walking improved, and he was learning to feed himself. At age

3, on 15 November 2013, he aged out of the CDSA therapy services in the home and

began to receive therapy at a local elementary school, but Mrs. Cheeks often failed to

take him to his therapy appointments because she “just didn’t feel like going” and

 -3-
 STATE V. CHEEKS

 Opinion of the Court

stopped completely in December 2014, one month after the birth of her second child

with Defendant.

 The therapists mentioned in the trial court’s findings of fact below had come to

the home to provide services to Malachi’s younger sisters, not Malachi, since Mrs.

Cheeks had stopped taking him to therapy appointments. 5 February 2015, was the

last day a therapist saw Malachi in the home, although she was there to provide

therapy for his sister. The therapist commented about how thin Malachi was

becoming. The therapist returned to the home for appointments in April but did not

see Malachi. After the April appointments, Mrs. Cheeks cancelled therapy for her

daughter.

 At about 10:00 p.m. on 11 May 2015, Ms. Cheeks called 911 regarding Malachi.

When EMS arrived, they found Malachi lying dead in an undecorated room. Malachi

was extraordinarily emaciated. Although he was nearly five years old, he was

wearing clothing sized for 24 months and 3T, and the clothes were hanging off of him.

His bones protruded, his stomach and face were taunt, and his head

disproportionately large for his body. The doctor that performed the autopsy

estimated that Malachi had been lying on his back after death from a few hours to

one or two days.

 Besides his obvious emaciation, Malachi had other injuries and signs of severe

and protracted neglect. He had head injuries and pressure ulcers where his bones

 -4-
 STATE V. CHEEKS

 Opinion of the Court

had laid against one another; injuries to his groin and genital area, including sores

in various stages of healing, some beyond the point of septic infection. Specialist

Justin Kirkland, crime scene investigator for the Gaston County Police Department,

had investigated crime scenes for almost 10 years. He was one of the first

investigators on the scene and took many of the photographs. Upon examining

Malachi, he noted that Malachi had

 a large sore on his right groin area. When we turned him
 over there was -- I would call it large sores, but it was
 severe diaper rash as well on his bottom. He had large sores
 on his bottom, something I have never seen before on a
 child in a death investigation.

The medical examiner also testified had never seen anything like Malachi’s pressure

sores and extreme diaper rash in a child.2 Neither of the other children were visibly

malnourished, and police found plenty of food in the home, in both the kitchen

cabinets and refrigerator.

 After Malachi’s death, officers from the Gaston County Police Department

interviewed both Defendant and Mrs. Cheeks several times regarding Malachi and

the events surrounding his death. Defendant made several conflicting statements to

police regarding Malachi’s death and his condition leading up to his death. Defendant

was not working and was the primary caregiver for Malachi for at least two months

before his death. On 11 May 2015, he initially told police he had fed Malachi

2These photographs are in our record, and, as the trial court put it, the “photographs of Malachi
Golden speak more volumes than any words ever could.”

 -5-
 STATE V. CHEEKS

 Opinion of the Court

Spaghettios but he had thrown up, and he had checked on him several times during

the day he died. In the second interview, on 14 May 2015, he gave a different timeline

of events and said he had fed Malachi a “Kid Cuisine,” a “grape-apple pouch[] squeeze

food,” and water. His third and final interview was on 30 October 2015 by Detective

Brienza. Detective Brienza received the original, unamended autopsy report on 15

October 2015.3 He then met with Defendant and Mrs. Cheeks again because the

“inconsistencies were too great at this point based on the autopsy report.” He found

inconsistencies in the medication Malachi should have been receiving for his seizure

disorder (since Mrs. Cheeks and Defendant claimed his doctors had taken him off

medication, but the medical records showed his physician had actually increased the

dosage), in the percentages of caretaking responsibilities between Defendant and

Mrs. Cheeks, the “huge discrepancy” as to the food Defendant had claimed to have

given Malachi and what was found on the autopsy, and evidence of head injuries.

 At the third interview, Defendant “had a couple different versions of killing

Malachi.” His first version was that “Malachi drowned because he gave him too much

fluid while in the bath tub” and Malachi had been dead for two days before the 911

call. Detective Brienza noted that the autopsy did not indicate Malachi had drowned.

Defendant then said he had put his hands around Malachi’s neck to keep him quiet.

3As discussed in detail below, the original autopsy report concluded Malachi had died from starvation
and dehydration. The autopsy report was amended after the medical examiner reviewed Defendant’s
third interview with Detective Brienza.

 -6-
 STATE V. CHEEKS

 Opinion of the Court

He said Malachi’s moaning “frustrated him greatly.” His “method of operation” was

to

 put his hands around Malachi’s throat and pick him up by
 his neck and choke him enough to quiet him. . . . Once
 Malachi would become limp, he would physically throw
 him in the Pack N Play from a distance, walk to the
 doorway, turn around to see if he was okay, if he was going
 to make any sound or movement. Once he saw that
 movement he then left.

 Defendant claimed he did this to Malachi “five times a week for the last two

months” and had been “throwing him around, smacking him, whooping him almost

on a daily basis[.]” Defendant said he was frustrated over Malachi’s moaning again

on 11 May 2015, so after using his regular “method of operation” to quiet him, he also

hit him several times on the head with a hard object. He said he watched Malachi

“take his last few gasps of breath.” He claimed “he bathed Malachi after he was dead

for a long period of time,” washing his hair and body as if he were alive, and then he

put clothing and a new diaper on him and placed him in his bed with a blanket over

him.

 Defendant testified at trial and gave yet another entirely different story of

what happened prior to Malachi’s death. He testified that after Mrs. Cheeks left for

work around noon, he changed Malachi’s diaper, applied diaper rash cream, and fed

him lunch. He could not recall exactly what Malachi ate, but it was “normal food”

such as “Kid Cuisine, Hungy-Man, hot dogs, chicken nuggets, french fries.” He also

 -7-
 STATE V. CHEEKS

 Opinion of the Court

gave him juice and put him back in his playpen. He then went to take care of the

other two children. Around 4:30 p.m., Malachi woke up and Defendant heard his

normal moaning sounds. His diaper was dry, so he did not need to be changed, and

he then fed Malachi some fruit snacks. He testified that Malachi “grabs as much as

he can and stuffs them in the mouth” but most of them he would end up missing his

mouth, so he would then give him more. He also fed him a Kid Cuisine, string cheese,

and yogurt bites at about 4:30 p.m. After Malachi ate, Defendant testified he gave

him a bath, changed his diaper, and put him back in his playpen. Defendant fed the

two girls as well, and by 5:30 p.m. all three children were sleeping, and he went

outside to smoke a cigarette. Defendant then came back inside and took a nap until

about 7:30 p.m. He then checked on Malachi, changed his diaper, and fed him again,

not a “whole meal” but string cheese and a Juicy Juice box. He then put Malachi back

in his playpen and tended to the other children. Sometime around 8:00 p.m. he

checked on Malachi again, and he appeared to be sleeping. He was not moaning, but

Defendant could hear him breathing. He went outside to smoke again, and Mrs.

Cheeks got home around 10:00 p.m. She went to check on Malachi and then called

for Defendant, saying, “There is something wrong with Malachi. I think he is dead.”

Defendant told her, “There is no way because I just checked on him hours before.”

Defendant said he took Malachi out of the playpen and laid him on the floor while

Mrs. Cheeks called 911. The 911 operator told them to administer CPR, so he tried

 -8-
 STATE V. CHEEKS

 Opinion of the Court

to administer CPR but did not want to use too much pressure, since he had only been

trained to do CPR on adults when he was in the military.

 Defendant testified at trial his statements to Detective Brienza were lies and

he had said what he did because “he told me we have this autopsy” but did not tell

him what the autopsy said. He said he drowned Malachi but Detective Brienza said

that was a lie based on the autopsy so Defendant “gave him another option saying I

hit him in the head.” Defendant denied that he had ever choked Malachi or thrown

him into the playpen to make him be quiet. Defendant claimed he told Detective

Brienza the things he did because “I was going to take the blame” to protect Mrs.

Cheeks. In response to the photographs of Malachi, Defendant testified, “I can’t

explain that. I know I fed my son.” He testified that his ribs did not look like they

did in the photographs, and his diaper rash was just regular diaper rash.

 Mrs. Cheeks also gave several different versions of events. In her initial

statement, she claimed she did not know what had happened to Malachi and neither

she nor Defendant realized he was dead until she found him and called 911. She then

gave a statement implicating Defendant on 2 November 2015, regarding his abuse of

Malachi and stating that she knew Defendant had killed Malachi. She said she

already knew Malachi was dead before she called 911, and she did not perform CPR

because she did not know how. Based upon her statement implicating Defendant,

she entered into a plea arrangement with the State and plead guilty to a reduced

 -9-
 STATE V. CHEEKS

 Opinion of the Court

charge of accessory after the fact of first degree murder and negligent child abuse

resulting in serious injury. But at trial, she recanted her prior statements against

Defendant and agreed that she “pretty much would do anything” for Defendant “to

be found not guilty.”4

 The trial court entered an order with findings of fact, and Defendant does not

challenge the findings of fact as unsupported by the record, so we will quote the trial

court’s order as to the facts5 of this case:

 1. The deceased victim was Malachi Golden, a four-year-old
 boy.

 2. Malachi Golden’s caregivers were his mother, Tiffany
 Cheeks, and Defendant.

 3. Tiffany Cheeks and Defendant married in November of
 2013.

 4. Defendant, Tiffany Cheeks, Malachi Golden and the two
 younger female half-siblings lived in an apartment in
 High Shoals.

 5. Malachi Golden’s younger half-siblings were the children
 of Defendant and Tiffany Cheeks.

4 Mrs. Cheeks had made statements regarding Malachi’s death to many people since his death, but
stated for the first time in her trial testimony that all of her prior statements were false: “Q. At what
point between the last time we talked and today did you decide you were going to come in here and
say that what you told in the past to me, people in the DA’s office, Detective Brienza, DSS workers,
that you were going to come in here and say that was all just a lie. A. Today.”

5 Because several of the trial court’s conclusions of law are actually findings of fact, we have quoted
those as well. See State v. Johnson, 246 N.C. App. 677, 683, 783 S.E.2d 753, 758 (2016) (“[W]e do not
base our review of findings of fact and conclusions of law on the label in the order, but rather, on the
substance of the finding or conclusion.”).

 - 10 -
 STATE V. CHEEKS

 Opinion of the Court

6. Malachi Golden died on May 11, 2015.

7. Malachi was discovered laying on the floor in a room that
 appeared more like a storage room than a child’s
 bedroom with materials piled in the comers and along
 the walls.

8. Inside the room was a “Pack and Play” a portable
 playpen for infants.

9. Malachi Golden spent the majority of the time during the
 last five months of his life in the “Pack and Play.”

10. At the time of death, Malachi Golden had a plastic
 appearance with sunken eyes, collarbones, protruding
 spine, protruding joints and protruding ribs.

11. At the time of death, Malachi Golden had very little
 body fat or muscle tissue.

12. At the time of death, Malachi Golden’s internal organs
 were about half the average size for a four-year-old boy.

13. Dehydration caused the abnormal size of the internal
 organs.

14. The dehydration occurred over several weeks.

I5. The autopsy revealed that Malachi Golden was
 malnourished and dehydrated.

16. At the time of death, Malachi Golden weighed 19
 pounds compared to the average weight of a [sic] 38-40
 pounds for a four-year-old boy.

17. At the time of death, Malachi Golden’s skin exhibited

 - 11 -
 STATE V. CHEEKS

 Opinion of the Court

 “tenting” a sign of acute dehydration.6

 18. At the time of death, Malachi Golden had a very wasted
 appearance.

 19. At the time of death, Malachi Golden’s skin also
 exhibited acute wrinkling in the armpit and hip joint
 areas which is a sign of severe malnutrition.

 20. Malachi Golden suffered acute diaper rash with
 extensive inflammation on his buttocks and groin.

 21. Some of the ulcers, or wounds, caused by the diaper
 rash were healing while others were open sores that
 exhibited bleeding.

 22. Malachi Golden suffered from the acute diaper rash for
 an extended period without proper treatment.

 23. Staying in soiled diapers for long periods of time caused
 the diaper rash.

 24. Malachi Golden also suffered from bed sores on his legs
 and knees from his lying in the “Pack and Play” for
 extensive periods of time without being moved or given
 proper attention.

 25. Doctors diagnosed Malachi Golden with a genetic
 disorder and seizure disorder shortly after birth.

 26. The seizures consisted of Malachi Golden losing control
 of his body and dropping to the ground.

6 We note that the word “acute” has an ordinary meaning which is different from its medical definition.
In the ordinary sense, acute means “very serious; critical; crucial.” Webster’s New World College
Dictionary (5th ed. 2014). In the medical sense, acute means “severe but of short duration; not chronic:
said of some diseases.” Id. In the findings, the trial court was clearly using “acute” in the ordinary
sense and not in the medical sense. The evidence showed the conditions described as “acute” in the
findings were serious, but all of the medical evidence characterized them as both serious (in the
ordinary sense) and chronic (in the medical sense).

 - 12 -
 STATE V. CHEEKS

 Opinion of the Court

27. Seizures would only last for a few seconds to a few
 minutes.

28. There was no danger that the seizures would cause
 death in and of themselves.

29. For Malachi Golden’s safety, he wore a helmet to
 protect his head when he dropped to the ground during
 a seizure.

30. Malachi Golden did not wear the helmet when he was
 in his “Pack and Play.”

31. Malachi Golden took the prescribed medication called
 Zonegram Zonisamide for his seizures.

32. Malachi Golden did well on medication and responded
 positively to therapy.

33. With medication and therapy, Malachi Golden began
 walking some and was feeding himself with
 supervision.

34. Malachi Golden’s walking improved from a few feet to
 the length of the courtroom by the time the caregivers
 stopped allowing the child to have therapy in December
 of 20l4.

35. The caregivers ceased Malachi Golden’s medication,
 medical care and therapy sessions at, or near,
 December of 2014.

36. The caregivers ceased all medication, medical care, and
 therapy sessions without consulting Malachi Golden’s
 physicians.

37. For the last few months of his life, Malachi Golden was
 cloistered from all adults except Tiffany Cheeks and
 Defendant.

 - 13 -
 STATE V. CHEEKS

 Opinion of the Court

38. During this period, Defendant became the primary
 caregiver for Malachi Golden and provided up to 80
 percent of the child’s care.

39. Defendant spent most of his time sleeping, watching
 movies or playing video games.

40. Defendant rarely fed Malachi Golden more than one
 time a day.

41. Neither Defendant nor Ms. Tiffany Cheeks ever took
 Malachi Golden to the doctor because of the weight loss.

42. Ms. Tiffany Cheeks was afraid that one day Defendant
 would hurt her.

43. Malachi Golden was a “chubby” child before October
 2013.

44. In December of 20l4, Malachi Golden was hungry when
 he met with the therapist at the school.

45. In January of 20l5, the home therapist working with
 Malachi Golden’s sibling commented to Ms. Tiffany
 Cheeks that the [sic] Malachi Golden appeared thin.

46. Ms. Tiffany Cheeks told the therapist that the doctor
 was taking care of it, when in fact Malachi had not seen
 a doctor for a long time.

47. Ms. Tiffany Cheeks canceled the sibling’s appointments
 with the therapist shortly after the above conversation
 during the January 2015 visit.

48. The caregivers had transportation to get Malachi
 Golden to a doctor’s office.

49. Both Defendant and Ms. Tiffany Cheeks recanted their
 interviews with the police where they admitted

 - 14 -
 STATE V. CHEEKS

 Opinion of the Court

 wrongdoing regarding the care of Malachi Golden.

50. Defendant contradicted himself several times on the
 stand during his testimony during the trial.

 Based upon the above FINDINGS OF FACT, the Court
concludes as a MATTER OF LAW that:

1. Dehydration causes the reduced size of internal organs.

2. “Tenting” demonstrates acute dehydration.

3. Acute wrinkling in the armpit and hip joint areas
 demonstrates severe malnutrition.

4. Staying in soiled diapers for long periods of time causes
 the diaper rash.

5. Acute diaper rash without proper treatment over an
 extended period will cause ulcers or wounds.

6. Defendant was a person providing care and supervision
 for Malachi Golden.

7. Defendant committed a grossly wanton negligent
 omission with reckless disregard for the safety of
 Malachi Golden by:

 a. Allowing the child to remain in soiled diapers until
 acute diaper rash formed on the groin and bottom of
 Malachi Golden which included open sores and
 ulcers; and

 b. Keeping the child in a playpen for so long of period
 that bed sores formed on Malachi Golden’s legs and
 knees;

8. The above sub-paragraphs caused the child extreme pain
 and with reckless disregard for human life.

 - 15 -
 STATE V. CHEEKS

 Opinion of the Court

 9. To starve someone is to “kill with hunger.”

 10. A reasonably careful and prudent person could foresee
 that failing to provide for a child’s nutritional needs
 would cause death.

 11. By feeding Malachi Golden typically only once a day
 and watching the child waste away to skin and bones,
 the Defendant intentionally starved the four-year old
 boy.

 12. Malachi Golden perished from the lack of food and life-
 sustaining liquids.

 13.Defendant’s starving Malachi Golden was the
 proximate cause of the child's death.

 14. Defendant’s failure to take any action to seek medical
 help, through any means possible, for Malachi Golden
 as the child wasted away from lack of nutrients needed
 for the maintenance of life was the commission of a
 homicide.

 The trial court then entered a verdict based upon the findings of fact and

conclusions of law as follows:

 1. Negligent Child Abuse - Resulting in Serious Bodily
 Injury

 GUILTY

 2. Child Abuse - Inflicting Serious Bodily Injury

 NOT GUILTY

 3. First Degree Murder with Premeditation and
 Deliberation Where a Deadly Weapon is Used
 NOT GUILTY

 - 16 -
 STATE V. CHEEKS

 Opinion of the Court

 4. First Degree Murder Committed in Perpetration of a
 Felony

 NOT GUILTY

 5. First Degree Murder by Torture

 NOT GUILTY

 6. First Degree Murder by Starving

 GUILTY

 SECOND DEGREE MURDER IS MOOT

The trial court sentenced defendant to life imprisonment without parole for first

degree murder and consolidated the negligent child abuse conviction into this

sentence. Defendant gave notice of appeal in open court.

 II. Trial Procedure

 We begin by addressing the trial court’s procedure in the case since no prior

appellate case addresses the hybrid procedure used by the trial court. Because of this

unusual procedure, the state makes various arguments regarding waiver of some

issues and both parties make arguments based upon different standards of review for

various issues, based upon either a bench trial or jury trial.

 Defendant waived trial by jury and elected to have a bench trial under North

Carolina General Statute § 15A-1201(b). In a criminal bench trial, the trial court is

not required to set forth the law it will follow in the form of jury instructions or to

 - 17 -
 STATE V. CHEEKS

 Opinion of the Court

make detailed findings of fact and conclusions of law. The trial court may enter a

general verdict, just as a jury would in a jury trial.

 Bench trials differ from jury trials since there are no jury
 instructions and no verdict sheet to show exactly what the
 trial court considered, but we also presume that the trial
 court knows and follows the applicable law unless an
 appellant shows otherwise. We follow this presumption in
 many contexts. For example, in a jury trial, if the trial
 court allows the jury to hear inadmissible evidence, this
 may be reason for reversal and a new trial, if such errors
 were material and prejudicial. But in a bench trial, we
 presume the trial court ignored any inadmissible evidence
 unless the defendant can show otherwise. We presume the
 trial court has followed “basic rules of procedure” in bench
 trials.

State v. Jones, ___ N.C. App. ___, ___, 816 S.E.2d 921, 924-25 (2018) (citations

omitted).

 In a civil bench trial, the trial court must make findings of fact and conclusions

of law to support its ruling, as required by North Carolina General Statute § 1A-A,

Rule 52. On appeal, the appellant must challenge specific findings of fact as

unsupported by the evidence. N.C. R. App. P. 28(b)(6). Where a trial court makes

findings of fact after a bench trial, appellate review is based upon those findings, and

not upon potential findings the trial court could have made based upon the evidence

but did not. But in a criminal jury trial, there is no requirement for findings of fact,

just a general jury verdict, so a defendant who appeals may challenge the sufficiency

of the evidence to support the jury’s verdict; there are no findings of fact to consider

 - 18 -
 STATE V. CHEEKS

 Opinion of the Court

on appeal. On appeal in a criminal jury trial, we view the evidence in the light most

favorable to the State and may draw any reasonable inferences based upon that

evidence to determine if the evidence is sufficient to support the verdict. State v.

Harris, 361 N.C. 400, 404, 646 S.E.2d 526, 529 (2007).

 Here, the trial court elected to follow a hybrid procedure by adopting “jury

instructions” setting forth the law it would apply to the case, as required in a jury

trial, but also made detailed findings of fact and conclusions of law supporting the

verdict, as is typical in a civil bench trial. The trial court explained why it requested

the parties to request jury instructions as they would in a jury trial:

 The reason I am asking for those patterned jury
 instructions. All I need is the substantive ones for the
 charges because, and please understand that having
 presided over bench trials for higher felonies before as well
 as discussing how to handle a bench trial with other
 superior court judges across the state that have also held
 them, it is our feeling that basically we operate the same
 as if there were 12 people in that box. Therefore, when it
 comes time for me to deliberate, we will actually have a
 conference over those three substantive charges. I will not
 go through the preliminary ones, the function of the jury
 and all that, but I do need the substantive charges, and
 that way we can all have a discussion so we know what the
 State has met on and what has not, and also, you all will
 know what I am deliberating with myself about.
 Also, throughout the trial, if we are moving from
 finder of fact to judge of law, I will place that on the record
 so the appellate courts will have the opportunity to know
 which role I was standing in when I was making certain
 comments.
 ....
 . . .We will actually have a conference just like we would if

 - 19 -
 STATE V. CHEEKS

 Opinion of the Court

 there was a jury here as to what the wording would be, and
 basically, it will be read or presented into the record as a
 document.7

 During the conference regarding the jury instructions, the trial court also

informed counsel it would not enter a general verdict as would be done by a jury, but

instead the trial court would enter a detailed order with findings of fact, conclusions

of law, and a verdict:

 THE COURT: . . .What you will find in the bench
 trial, the fact finder will produce a set of findings of fact
 and conclusions, and finally, its decision so that the
 appellate courts will know what facts it took. . . .

 MR. RATCHFORD: Your Honor, if I may, if I can go
 back to your statement. Is that going to be delineated on
 the verdict sheet?

 THE COURT: Well, there is not really a verdict
 sheet as such. There will be a judgment. In other words,
 each of the charges will be found to be either guilty or not
 guilty at the end of the judgment. It will have the
 equivalence of the verdict sheets, but it is going to be all in
 one document. You will have the findings of fact that I used
 and conclusions of law that I made and then my verdict.

 MR. RATCHFORD: So I am trying to think through
 this. As findings of fact as a trier of the fact, would that be
 delineated out such as the medicine or the lack of
 nutrition?

 THE COURT: Or strangulation or hitting on the
 head.

7 Instead of reading the instructions into the record, the trial court included in the record Court’s
Exhibit 1, which is a copy of the jury instructions as modified by the trial court during the charge
conference. Both parties agreed there was no need for the trial court to read the instructions aloud to
itself in open court.

 - 20 -
 STATE V. CHEEKS

 Opinion of the Court

 MR. RATCHFORD: Thank you.

 THE COURT: The judgment part of it, instead of
 having like, for instance, you would normally have a
 verdict sheet for first degree murder and then it would
 have guilty not guilty. It will have first degree murder
 based on whatever the elements are and so forth that are
 found. That would also cover whether it is a B1 or B2 when
 I am finding in that. It will be stated out so that Court of
 Appeals knows which one I was considering based on the
 findings of fact.

After further discussion of the process and order, which would take the place of a

verdict sheet, counsel for defendant stated:

 MR. RATCHFORD: I think what Ms. Hamlin and I
 are thinking, we are trying to still make this a jury trial. I
 think what your Honor is looking at doing basically
 negate[s] the necessity of a verdict sheet.

 THE COURT: I will be quite honest with you, having
 the record overloaded gives the Court of Appeals much
 more of an understanding of what we were doing here.

 MS. HAMLIN: I guess the one question -- and I am
 fine with whatever Mr. Ratchford -- if he wants to have
 these verdict sheets. Sometimes in other cases I have had
 we have submitted on say two, P & D, specific intent, and
 then felony murder say. When we submit those, there is
 situations where they find them guilty on both. Does that
 make sense? That’s what I was wondering. When you go
 down you are going to do each?

 THE COURT: Anything I find the individual guilty
 of will be completely.

 - 21 -
 STATE V. CHEEKS

 Opinion of the Court

 We appreciate the trial court’s attention to detail and effort to provide this

Court with a full understanding of the law applied and the facts it determined to be

true. Charges of murder by starvation are rare; this is an unusual case, and the trial

court handled it carefully. The additional procedural steps used by the trial court are

fully within the trial court’s discretion, but we note they are not required by the North

Carolina Rules of Criminal Procedure or Chapter 15A, Article 73 of North Carolina’s

General Statutes.

 III. Standard of Review

 Here, because the trial court made detailed findings of fact, our manner of

review of Defendant’s challenge to sufficiency of the evidence differs somewhat from

most criminal cases. We will review the trial court’s order based upon the standards

of review as set forth for findings of fact in criminal cases regarding motions to

suppress and motions for a new trial, since we have been unable to find any cases

addressing review of an order with findings of fact in a criminal bench trial.

 Findings of fact are binding and are conclusive on appeal
 when they are supported by competent evidence. The
 findings of fact must support and justify the conclusion of
 law.

State v. Saults, 299 N.C. 319, 322, 261 S.E.2d 839, 840-41 (1980) (citations omitted).

 Although there may be evidence which would support different findings of fact,

if the trial court’s findings are supported by competent evidence, they are binding on

appeal. See State v. Williams, 308 N.C. 47, 60, 301 S.E.2d 335, 344 (1983) (“[T]he

 - 22 -
 STATE V. CHEEKS

 Opinion of the Court

trial court’s ruling will not be disturbed on appeal, notwithstanding the fact that

there was evidence from which a different conclusion could have been reached.”

(citing State v. Gray, 268 N.C. 69, 150 S.E.2d 1 (1966))). “The trial court’s conclusions

of law, however, are reviewable de novo.” State v. Hyatt, 355 N.C. 642, 653, 566

S.E.2d 61, 69 (2002)).

 Defendant also challenges the sufficiency of the evidence to support the verdict,

as is typical in a criminal jury trial. We review the trial court’s ruling on the motion

to dismiss for insufficiency of the evidence de novo:

 A trial court, on a motion to dismiss for insufficient
 evidence, “must determine only whether there is
 substantial evidence of each essential element of the
 offense charged and of the defendant being the perpetrator
 of the offense.” “Whether evidence presented constitutes
 substantial evidence is a question of law for the court” and
 is reviewed de novo. “Substantial evidence is relevant
 evidence that a reasonable mind might accept as adequate
 to support a conclusion.” In reviewing the denial of a
 motion to dismiss for insufficiency of the evidence, “we
 must view the evidence in the light most favorable to the
 State, giving the State the benefit of all reasonable
 inferences.” “Any contradictions or discrepancies in the
 evidence are for the jury to resolve and do not warrant
 dismissal.”

State v. Glisson, ___ N.C. App. ___, ___, 796 S.E.2d 124, 127-28 (2017) (citations

omitted).

 IV. Sufficiency of the Evidence to Support Verdict of Murder by Starvation

A. Murder by Starving

 - 23 -
 STATE V. CHEEKS

 Opinion of the Court

 1. Preservation of Issue

 Defendant first argues the trial court erred by not granting his motion to

dismiss based upon insufficient evidence he murdered Malachi by starvation. The

State contends that Defendant failed to preserve this issue for review by his general

motion to dismiss, noting that Defendant’s motion to dismiss failed to identify the

charge of murder by starvation.

 Defendant made a general motion to dismiss at the close of the State’s

evidence, and the trial court denied the motion:

 MR. RATCHFORD: Your Honor, we would make a
 motion to dismiss, the standard of the State’s evidence
 motion. We do not wish to be heard or argue further.

 THE COURT: When all of the evidence is taken in
 the light most favorable to the nonmoving party, the Court
 believes there is sufficient evidence to go forward and will
 deny the motion at this time.

Defendant renewed this motion at the close of all of the evidence, again with no

additional argument.

 The State is correct that if a Defendant makes a specific argument regarding

the basis for dismissal of a particular charge before the trial court and then attempts

to make a different argument for that particular charge on appeal, the Defendant has

waived the new argument by his failure to present it to the trial court, based upon

the theory that the defendant may not “swap horses” on appeal. State v. Sharpe, 344

N.C. 190, 194, 473 S.E.2d 3, 5 (1996). But prior cases have held that where the

 - 24 -
 STATE V. CHEEKS

 Opinion of the Court

Defendant makes a general motion to dismiss, he has preserved his challenge to the

sufficiency of the evidence to support all of the crimes charged.

 To preserve an issue for appellate review, “a party
 must have presented to the trial court a timely request,
 objection, or motion, stating the specific grounds for the
 ruling the party desired the court to make if the specific
 grounds were not apparent from the context.” Rule 10(a)(3)
 of the North Carolina Rules of Appellate Procedure
 provides further that
 in a criminal case, a defendant may not make
 insufficiency of the evidence to prove the
 crime charged the basis of an issue presented
 on appeal unless a motion to dismiss the
 action, or for judgment as in case of nonsuit,
 is made at trial. If a defendant makes such a
 motion after the State has presented all its
 evidence and has rested its case and that
 motion is denied and the defendant then
 introduces evidence, defendant’s motion for
 dismissal or judgment in case of nonsuit made
 at the close of State’s evidence is waived. Such
 a waiver precludes the defendant from urging
 the denial of such motion as a ground for
 appeal.
 A defendant may make a motion to dismiss
 the action, or for judgment as in case of
 nonsuit, at the conclusion of all the evidence,
 irrespective of whether defendant made an
 earlier such motion. If the motion at the close
 of all the evidence is denied, the defendant
 may urge as ground for appeal the denial of
 the motion made at the conclusion of all the
 evidence. However, if a defendant fails to
 move to dismiss the action, or for judgment as
 in case of nonsuit, at the close of all the
 evidence, defendant may not challenge on
 appeal the sufficiency of the evidence to prove
 the crime charged.

 - 25 -
 STATE V. CHEEKS

 Opinion of the Court

 Our courts have long held that “where a theory
 argued on appeal was not raised before the trial court, the
 law does not permit parties to swap horses between courts
 in order to get a better mount in the appellate courts.” This
 “swapping horses” argument historically has applied to
 circumstances in which the arguments on appeal were
 grounded on separate and distinct legal theories than those
 relied upon at the trial court, or when a sufficiency of the
 evidence challenge on appeal concerns a conviction
 different from a charge challenged before the trial court.

State v. Walker, ___ N.C. App. ___, ___, 798 S.E.2d 529, 530 (citations and brackets

omitted), review denied, 369 N.C. 755, 799 S.E.2d 619 (2017).

 Here, Defendant did not swap horses on appeal; the horse he rode in the trial

court was insufficiency of the evidence in general to support all of the charges, and

he rides the same horse on appeal in his argument regarding the first degree murder

conviction. This case is more akin to State v. Glisson:

 Defendant’s motion to dismiss required the trial
 court to consider whether the evidence was sufficient to
 support each element of each charged offense. The trial
 court acknowledged Defendant’s contention that the State
 “simply failed to offer sufficient evidence on each and every
 count as to justify these cases to survive a motion to
 dismiss.” The trial court referred to the motion as “global”
 and “prophylactic,” acknowledging on the record that
 Defendant’s motion was broader than the single oral
 argument presented. In ruling on the motion to dismiss,
 the trial court stated that “the State has offered sufficient
 evidence on each and every element of all the surviving
 charges to justify these cases being advanced to the jury.”
 Counsel’s oral argument challenging a single aspect of the
 evidence does not preclude Defendant from arguing other
 insufficiencies in the evidence on appeal. So we will
 address the merits of Defendant’s argument challenging

 - 26 -
 STATE V. CHEEKS

 Opinion of the Court

 the sufficiency of the evidence to support the conspiracy
 charge.

___ N.C. App. at ___, 796 S.E.2d at 127 (citation omitted). We will therefore consider

Defendant’s challenge to sufficiency of the evidence.

 2. Definition of “Starving” Under North Carolina General Statute
 § 14-17(a)

 Defendant’s specific argument on appeal regarding insufficiency of the

evidence is that the evidence cannot support a conviction of first degree murder by

starvation. Defendant notes correctly that in North Carolina “there are no cases

upholding convictions for first-degree murder by starving under [North Carolina

General Statute § 14-17(a)].” But there is also no case in North Carolina reversing a

conviction for first degree murder by starvation; this is a case of first impression.

Indeed, there are very few cases of first degree murder by starvation reported in the

United States.

 Defendant was charged and convicted of murder by starving under North

Carolina General Statute § 14-17(a):

 A murder which shall be perpetrated by means of a
 nuclear, biological, or chemical weapon of mass destruction
 as defined in G.S. 14-288.21, poison, lying in wait,
 imprisonment, starving, torture, or by any other kind of
 willful, deliberate, and premeditated killing, or which shall
 be committed in the perpetration or attempted
 perpetration of any arson, rape or a sex offense, robbery,
 kidnapping, burglary, or other felony committed or
 attempted with the use of a deadly weapon shall be deemed
 to be murder in the first degree, a Class A felony, and any

 - 27 -
 STATE V. CHEEKS

 Opinion of the Court

 person who commits such murder shall be punished with
 death or imprisonment in the State's prison for life without
 parole as the court shall determine pursuant to G.S. 15A-
 2000, except that any such person who was under 18 years
 of age at the time of the murder shall be punished in
 accordance with Part 2A of Article 81B of Chapter 15A of
 the General Statutes.

N.C. Gen. Stat. § 14-17(a) (2017) (emphasis added).

 At trial, at the end of the day on 30 October 2017, the trial court discussed the

definition of starvation with counsel during its charge conference and invited counsel

to research the issue overnight to propose guidance on the proper definition. The

next morning, the trial court noted the results of its research on the issue, which was

included in the record as part of Court’s Exhibit 1 as the definitions of starvation

from a variety of sources, as follows:

 Starvation is the result of a severe or total lack of nutrients
 needed for the maintenance of life.
 https://medicaldictionary.thefreedictionary.com/starvation

 To starve someone is to “kill with hunger;” to be starved is
 to “perish from lack of food.” Starving: Medical Definition,
 Merriam-Webster Dictionary, http://www.merriam-
 webster.com/medical/starving (last visited Apr. 16,2012).

 COMMENT: KinderLARDen Cop: Why States Must Stop
 Policing Parents of Obese Children. 42 Seton Hall L. Rev.
 1783. 1801

 To starve someone is the act of withholding of food, fluid,
 nutrition, Rodriguez v. State, 454 S.W.3d 503, 505 (Tex.
 Crim. App. 2014)

 Starving can result from not only the deprivation of food,

 - 28 -
 STATE V. CHEEKS

 Opinion of the Court

 but also liquids. Deprivation of life-sustaining liquids
 amounts to starvation under the statute. A specific intent
 to kill is . . . irrelevant when the homicide is perpetrated by
 means starving, or torture. State v. Evangelista, 319 N.C.
 152 (1987)

 When a homicide is perpetrated by means of poison, lying
 in wait, imprisonment, starving or torture, the means and
 method used involves planning and purpose. Hence, the
 law presumes premeditation and deliberation. The act
 speaks for itself.

 State v. Dunheen, 224 N.C. 738,739, 32 S.E.2d 322, 323
 (1944)

(Alteration in original). After the trial court provided the definitions above, counsel

for defendant noted that his research “found almost the exact same thing.” The trial

court then stated it would rely upon State v. Evangelista and the definitions listed

above as the definition of starvation in its deliberations. Defendant had no objection

or proposed modification to this definition to include a complete deprivation of food

and liquids.

 As the trial court noted, the statute does not define “starving,” but in State v.

Evangelista, our Supreme Court in dicta noted that the evidence in that case would

have supported a theory of murder by starvation. 319 N.C. 152, 158, 353 S.E.2d 375,

380 (1987). In Evangelista, the trial court “[f]rom an abundance of caution” submitted

the charge of first degree murder of an 8 month old baby to the jury based on the

“theory of ‘murder perpetrated by any other kind of willful, deliberate and

premeditated killing’” instead of the theory of starving. Id. In Evangelista, the

 - 29 -
 STATE V. CHEEKS

 Opinion of the Court

baggage master on an Amtrak train saw bullet holes in the door of a compartment

and heard loud voices inside. Id. at 155, 353 S.E.2d at 378. Others on the train heard

sounds of a crying baby, breaking glass, screaming, and gunshots in the

compartment. Id. They called the police, who determined that the occupants of the

compartment were the defendant, his sister, and her two children, ages 8 months and

3 years. Id. at 155, 353 S.E.2d at 378-79. The car was separated from the rest of the

train and thus was cut off from access to a water supply. Id. at 155, 353 S.E.2d at

379. For three days, defendant remained barricaded in the car while police tried to

negotiate with him. Id. The negotiators repeatedly asked the defendant to come out

or at least to release the children. Id. at 156, 353 S.E.2d at 379. They offered food

and liquids for him and the children, but he refused. Id. They also warned him

regarding the safety of the children and that they could not survive without food and

water. Id. Ultimately, when police entered the train car, they found the woman

deceased from a gunshot wound and the 8 month old baby deceased from dehydration.

Id.

 The Supreme Court upheld the defendant’s conviction for murder of the baby

based upon “willful, deliberate and premeditated killing, but noted that the evidence

would have supported murder by starvation as well”:

 We note that the evidence in the present case would
 have supported conviction of the defendant for the first
 degree murder of the infant on the theory of murder
 perpetrated by means of starvation, specifically declared to

 - 30 -
 STATE V. CHEEKS

 Opinion of the Court

 be first degree murder by the statute. The evidence tended
 to show that the defendant deprived the infant male of
 liquids and thereby caused his death. Liquids are
 necessary in the nourishment of the human body,
 especially as here in the case of an infant. Therefore,
 deprivation of life-sustaining liquids amounts to starvation
 under the statute. If the trial court had submitted the case
 to the jury on the theory of starvation, it would not have
 been necessary that the State prove a specific intent to kill.
 As we said in State v. Johnson, “a specific intent to kill is .
 . . irrelevant when the homicide is perpetrated by means of
 poison, lying in wait, imprisonment, starving, or torture. .
 . .”

Id. at 158, 353 S.E.2d at 380 (alterations in original).

 Although the statute does not define murder by starving, Evangelista provides

a definition of starving: death from the deprivation of liquids or food “necessary in

the nourishment of the human body” may amount to starvation under North Carolina

General Statute § 14-17(a). See id.

 Defendant argues that “a homicide resulting from the failure to provide

sufficient food, as opposed to the complete denial of food, will not ipso facto constitute

murder by ‘starving’ as the term is used in N.C.G.S. 14-17.” (First emphasis added.)

Defendant derives this argument from two cases upholding convictions of involuntary

manslaughter of children who died from malnutrition or starvation, State v. Fritsch,

351 N.C. 373, 526 S.E.2d 451 (2000), and State v. Mason, 18 N.C. App. 433, 197 S.E.2d

79 (1973). Defendant notes that “unlike Evangelista, there is no suggestion in Mason

or Fritsch that the evidence in those cases would have supported a conviction for first-

 - 31 -
 STATE V. CHEEKS

 Opinion of the Court

degree murder by starvation.” This is correct, but the absence of dicta regarding first

degree murder by starvation in Mason and Fritsch is not helpful to our analysis. In

Evangelista, the defendant was charged with first degree murder under several

theories, including starving, but the trial court elected not to submit that theory to

the jury, so our Supreme Court noted that the evidence would have supported this

theory in addition to those considered by the jury. 319 N.C. at 158, 353 S.E.2d at 380.

In Fritsch, the defendant was not charged with murder. 351 N.C. at 374, 526 S.E.2d

at 452. The defendant in Fritsch was charged with felonious child abuse and

involuntary manslaughter and convicted of non-felonious child abuse and involuntary

manslaughter. Id. The defendants in Mason were charged with murder but the trial

court reduced the charge to involuntary manslaughter at the close of the State’s

evidence, and the defendants were convicted of involuntary manslaughter. 18 N.C.

App. 433, 197 S.E.2d 79. In each case, there was evidence of other abuse or neglect

of the child beyond deprivation of food and water, but the situations are all different.

The defendants in each case were charged with the crimes the prosecutor in his or

her discretion elected to pursue and the juries considered the theories the trial court

determined were supported by the evidence in that particular case. As the State

argues,

 By defendant’s absurd logic, anyone who claims—or
 can definitely prove—they fed their child some amount of
 food or water cannot be guilty of murder. If that were so,
 short deaths (with arguably less suffering) would be

 - 32 -
 STATE V. CHEEKS

 Opinion of the Court

 murder. Protracted deaths—a child intentionally, cruelly,
 but slowly, starved to death—only manslaughter. A
 defendant who fed his victim one tablespoon of food a day,
 or three teaspoons thrice a day—three square meals—
 could not be guilty of murder.

We have been unable to find any support in the law for Defendant’s argument that

murder by starvation requires the complete denial of all food or water (or both) for a

certain period of time. We also note that Defendant did not present this proposed

definition of starvation to the trial court and had no objection to the definition of

starvation announced by the trial court. Murder by starving requires the willful

deprivation of sufficient food or hydration to sustain life. The deprivation need not

be absolute and continuous for a particular time period. As the Evangelista court

noted, a baby or small child would likely not be able to survive as long as a healthy

adult, so the duration of starvation needed to cause death will vary, but if the

deprivation is so severe as to cause death, it may be the basis for murder by starving.

See Evangelista, 319 N.C. at 158-59, 353 S.E.2d 375, 380-81.

 We again note the unusual posture of this appeal, as a criminal bench trial

where the trial court made specific findings of fact instead of simply giving its verdict.

Since the trial court made findings of fact, Defendant must challenge the sufficiency

of the evidence to support those findings on appeal. See State v. Durham, 74 N.C.

App. 121, 123, 327 S.E.2d 312, 314 (1985) (“Failure to except to individual findings

waives any challenge to the sufficiency of the evidence to support them.” (citing State

 - 33 -
 STATE V. CHEEKS

 Opinion of the Court

v. Ford, 70 N.C. App. 244, 318 S.E.2d 914 (1984))). Defendant did not challenge on

appeal the sufficiency of the evidence to support any of the trial court’s specific

findings of fact regarding Malachi’s physical condition as quoted above. We therefore

consider those findings conclusive on appeal.8 Id. Based upon the evidence and the

trial court’s findings, the State met its burden of proving that for an extended period,

two months or more, Defendant denied Malachi of sufficient food and hydration to

survive. According to the findings, Malachi was “chubby” before October 2013. In

December of 2014, a therapist noticed he was hungry, and by January 2015, a

therapist noticed he was very thin. Shortly thereafter, Defendant and Ms. Golden

stopped allowing therapists in the home, and Malachi was “cloistered” in the home

until his death. That fact that Malachi was wasting away would have been obvious

to Defendant, and Defendant was by his own testimony Malachi’s primary caretaker

for the last months of his life. But he took no action to seek medical assistance or to

provide more sustenance to him. As the trial court accurately stated to Defendant at

the close of the trial, “the photographs of Malachi Golden speak more volumes than

any words ever could. There is no way that you did not starve that child to death.”

This argument is overruled.

 3. Legal Duty to Feed

8 Even if Defendant’s argument could be construed as a challenge to specific findings of fact, we have
reviewed the record, and the trial court’s findings are fully supported by the evidence.

 - 34 -
 STATE V. CHEEKS

 Opinion of the Court

 Defendant argues that “[t]here was no evidence, and the trial court did not

find, that [Defendant] was under a legal duty to feed Malachi.” Defendant again

seeks to rely upon Fritsch and Mason to support this argument as to a “legal duty,”

noting that the defendants in those cases “were natural parents of the decedents, so

this element was not in question and those cases do not elaborate further on the

requirement.” Beyond this, Defendant cites various cases from other states. We also

note that the Defendant did not request that the trial court consider a legal duty to

feed as part of the jury instructions. The State cites cases from other states holding

otherwise, but none of these cases address first degree murder under a statute

comparable to North Carolina General Statute § 14-17.

 We first note that the trial court made several findings and conclusions which

would support a legal duty to feed Malachi, including Defendant’s position as a

“caregiver” for Malachi providing about 80% of his care in the months immediately

preceding his death.9 But based upon North Carolina General Statute § 14-17 and

Evangelista, we can find no support for the necessity of a separate element of a “legal

duty to feed” for murder by starving. In Evangelista, the defendant was an uncle of

the deceased child, but his familial relationship was irrelevant. 319 N.C. at 155, 353

S.E.2d at 379. There is no indication in Evangelista he was ever a “caregiver” for his

9In fact, being a caregiver for the child is one of the elements of negligent child abuse under North
Carolina General Statute § 14-318.4(a4), and the trial court found defendant guilty of this charge as
well.

 - 35 -
 STATE V. CHEEKS

 Opinion of the Court

sister’s child. See id. The relevant fact was that he barricaded himself into a train

car with the child and would not accept offers of food and water from the police. Id.

The Evangelista defendant had no “legal duty” to feed his sister’s child before he

barricaded them into the train car, but then he placed the child in circumstances

where he was entirely dependent upon defendant for food and water and the

defendant intentionally failed to provide food and water to the child. If Defendant’s

argument there must be a “legal duty” to feed to support a conviction of murder by

starvation were correct, then a defendant who shuts his victim into a locked room

with no food or water and no means to escape must first have an independent “legal

duty” to provide food to the victim before he could be convicted of murder by starving.

This is not the law. As a four-year old child with developmental delays, Malachi

depended entirely upon Defendant and his mother for all of his needs, including food

and water, and, by their own testimony, both were fully aware of his dependency upon

them. No further “legal duty” is necessary. This argument is overruled.

 4. Malice

 Defendant next argues that “the trial court’s findings are insufficient to

support the verdict because malice is an essential element of murder by starving, but

the trial court did not determine that defendant acted with malice.” The State argues

that no separate finding of malice is required for first degree murder under North

Carolina General Statute § 14-17.

 - 36 -
 STATE V. CHEEKS

 Opinion of the Court

 Defendant seeks to derive from Mason, Fritsch, and 61 A.L.R.3d 1207 the

proposition that “[a]bsent a showing of malice, the failure of a parent to meet the legal

obligation to provide a child sufficient food would have been manslaughter, not

murder, at common law.” But our Supreme Court has clearly held that no separate

showing of malice is required for first degree murder by the means set forth under

North Carolina General Statute § 14-17:

 This Court has previously concluded that N.C.G.S. §
 14-17 “separates first-degree murder into four distinct
 classes as determined by the proof: (1) murder perpetrated
 by means of poison, lying in wait, imprisonment, starving,
 or torture; (2) murder perpetuated by any other kind of
 willful, deliberate, and premeditated killing; (3) murder
 committed in the perpetration or attempted perpetration of
 certain enumerated felonies; and (4) murder committed in
 the perpetration or attempted perpetration of any other
 felony committed or attempted with the use of a deadly
 weapon.” “Any murder committed by means of poison is
 automatically first-degree murder.” As this Court has
 previously stated, “premeditation and deliberation is not
 an element of the crime of first-degree murder perpetrated
 by means of poison, lying in wait, imprisonment, starving,
 or torture; and an intent to kill is not an element of first-
 degree murder where the homicide is carried out by one of
 these methods.”
 “Malice, as it is ordinarily understood, means not
 only hatred, ill will, or spite, but also that condition of mind
 which prompts a person to take the life of another
 intentionally, without just cause, excuse, or justification, or
 to wantonly act in such a manner as to manifest depravity
 of mind, a heart devoid of a sense of social duty, and a
 callous disregard for human life.” This Court has already
 stated that murder by torture, which is in the same class
 as murder by poison, “is a dangerous activity of such
 reckless disregard for human life that, like felony murder,

 - 37 -
 STATE V. CHEEKS

 Opinion of the Court

 malice is implied by the law. The commission of torture
 implies the requisite malice, and a separate showing of
 malice is not necessary.” We hold that the same reasoning
 applies for the crime of first-degree murder by poison and
 conclude that a separate showing of malice is not
 necessary. Thus, this assignment of error is overruled.

State v. Smith, 351 N.C. 251, 267, 524 S.E.2d 28, 40 (2000) (citations, brackets, and

ellipsis omitted).

 Just as with poisoning or torture, murder by starving “implies the requisite

malice, and a separate showing of malice is not necessary.” Id. Malice is not a

separate element of murder by starving under North Carolina General Statute § 14-

17, so the trial court did not err by not making a finding or conclusion as to malice.

This argument is overruled.10

B. Causation of Death

 Defendant argues there was “no evidence that Malachi’s death was caused by

starvation.” Defendant bases this argument upon evidence he argues could indicate

that other factors contributed to Malachi’s death, including his genetic abnormalities,

seizures, and abuse by Defendant. Defendant also argues that Dr. Jonathan Privette,

medical examiner and forensic pathologist with the Mecklenburg County Examiner’s

Office, “unequivocally testified that the cause of Malachi’s death was asphyxia due to

strangulation,” not starvation. (Emphasis added.) But Defendant’s argument

10 Defendant also argues that “the trial court committed plain error by failing to instruct itself that
malice is an element of murder by starvation.” Since we have determined that malice is not an element
of murder by starvation, we need not address this argument.

 - 38 -
 STATE V. CHEEKS

 Opinion of the Court

ignores much of Dr. Privette’s testimony and particularly the fact that Dr. Privette’s

opinion regarding strangulation was based solely upon Defendant’s statement to

Detective Brienza he had strangled Malachi. Dr. Privette first determined that

starvation and dehydration caused Malachi’s death and considered strangulation as

a potential cause based only upon Defendant’s statement to Detective Brienza,

months after Malachi’s death, that he had choked Malachi.

 Dr. Privette testified at length regarding the autopsy and his determination

that Malachi had died from malnutrition and dehydration. He described Malachi’s

autopsy and the physical findings including his weight, the unusually small size of

his internal organs, his wasted appearance, his loose skin, and the severe dermatitis

in his diaper area. He also testified regarding various laboratory findings, such as

isonatremic dehydration. He explained that isonatremic dehydration means that the

sodium level in Malachi’s body was essentially normal but he was severely

dehydrated. With a sudden, acute dehydration, the sodium level would go up, but

with chronic dehydration, over an extended period of time, the kidneys try to adapt

to the reduced intake of liquid and adjust the sodium level so it does not get too high.

Thus, Malachi was chronically dehydrated, over a period of time of “more than a few

days” and “probably weeks.”11 Dr. Privette could not determine exactly when Malachi

11Defendant argues that “chronic” malnutrition and dehydration, as opposed to an “acute” condition,
does not support death by starvation. This interpretation of the evidence is not supported by Dr.
Privette’s testimony. He explained the difference: “When a person gets acutely dehydrated we can see

 - 39 -
 STATE V. CHEEKS

 Opinion of the Court

had died, but based upon his condition, he believed “he died one to two days” before

12 May 2015, when he performed the autopsy.

 Besides his findings regarding dehydration and malnourishment, Dr. Privette

found a bruise on the top of Malachi’s head; a fresh subgaleal hemorrhage on his left

forehead,12 and pressure ulcers on his knees. Dr. Privette also examined Malachi’s

prior medical records up to 2013 and spoke to some physicians who had treated him

and learned that he had a chromosomal disorder which may have caused the seizure

disorder.13 Dr. Privette’s initial impression after the autopsy and review of medical

records was that Malachi died from malnutrition and dehydration. He had concerns

regarding the genetic abnormality but determined that the particular abnormality

Malachi had did not account for his presentation. Although his autopsy report noted

the genetic abnormality, the defect did not directly contribute to his death.14 He noted

that if the genetic defect “prevented him from being able to get up and feed himself

acute dehydration if only dehydrated for a few days. If someone has a GI infection and vomiting and
diarrhea and this is going on for a couple days and gets dehydrated, you can see affects [sic] of acute
dehydration or presentation of acute dehydration. Chronic dehydration is you are talking more than a
few days, this is probably weeks.”

12 The subgaleal hemorrhage was through the full thickness of the scalp, and this would take more
force to generate bleeding to this level than the bruise on the top of his head. Dr. Privette testified
this hemorrhage was consistent with being struck on the head.

13
 Dr. Privette was unable to review more recent medical records because Mrs. Cheeks stopped taking
Malachi to his physicians.

14 Dr. Robinett, Malachi’s pediatric neurologist, testified that it would be “unusual, highly unusual”
for seizures of the type Malachi suffered to cause death.

 - 40 -
 STATE V. CHEEKS

 Opinion of the Court

and go get water, which you would expect a normal four-year old to be able to do,”

then the underlying genetic abnormality could have contributed to his death because

he had to rely solely upon his caregivers to provide food and water.

 Dr. Privette testified that the contents of Malachi’s stomach was

approximately 100 milliliters of “clear fluid” with “”fragments of semi-solid white

material consistent with dairy product.” Defendant testified that he fed Malachi

repeatedly on the day of his death, but Dr. Privette’s autopsy did not find indications

of the food Defendant testified he had given Malachi on the day of his death.

 After the autopsy, as part of his investigation as to the cause of death, Dr.

Privette later reviewed statements from defendant and Ms. Cheeks regarding

Malachi’s death. Portions of their statements were generally consistent with the

physical findings. Defendant had stated that he had hit Malachi on the head at least

twice, which was consistent with the two head injuries found during the autopsy.

Defendant had also told police he would put his hands around Malachi’s neck to make

him be quiet, and that he had done this repeatedly. Defendant also said that he had

put pressure on Malachi’s neck and watched him take his last breath. Dr. Privette

noted that it would take very little pressure to cut off the blood flow to Malachi’s

brain, given his extremely weak state, so he would not expect necessarily to see any

signs of bruising or injury to Malachi’s neck. Even pressure by two fingers on his

neck, for a very brief time, could result in death due to his debilitated state, while a

 - 41 -
 STATE V. CHEEKS

 Opinion of the Court

healthy person, if the pressure is released, the person should “come around and be

okay.” Ultimately, Dr. Privette testified that the causes of Malachi’s death were

“inflicted pressure on the carotid arteries or basically asphyxia”—based only upon

Defendant’s claims in his third interview—and that “the malnourished state would

have contributed to his death.”

 Although Dr. Privette’s initial autopsy report identified

“malnutrition/dehydration” as the immediate cause of Malachi’s death, he amended

his report to include “strangulation” as the cause of death after reading the interview

transcripts from Ms. Cheeks and Defendant. If Dr. Privette had any reason to suspect

strangulation at the time of the autopsy, such as bruising, he would have done and

“in situ neck dissection” to try to find additional evidence of strangulation. But he

saw no signs of strangulation during the autopsy and had no reason to do further

investigation.15 He testified the amendment to the autopsy report was based “solely”

upon defendant’s and Mrs. Cheeks’s statements that defendant had strangled

Malachi. He also agreed that “[i]f those statements were deemed to be faulty or not

the truth,” there was “no objective scientific evidence to suggest strangulation.” Thus,

his opinion of strangulation as a contributing factor to Malachi’s death was based

15Although Defendant and Mrs. Cheeks both gave statements to the police immediately after
Malachi’s death, neither mentioned any abuse or possible strangulation until their later interviews,
months after Malachi’s death.

 - 42 -
 STATE V. CHEEKS

 Opinion of the Court

solely on the later statements of Defendant and Mrs. Cheeks and he found “no

positive physical findings” of strangulation.

 As the trier of fact, the trial court did not have to believe Defendant’s statement

to Detective Brienza he strangled Malachi, and this was the only basis for Dr.

Privette’s testimony that Malachi may have been strangled. Both Defendant and

Mrs. Cheek gave several different versions of what happened to Malachi. Some of

these statements, such as Defendant’s claim of drowning Malachi, were refuted by

the autopsy. Defendant’s trial testimony of repeatedly feeding Malachi, changing his

diaper, and bathing him on the day of his death is patently incredible, given the

condition of Malachi’s body when EMS arrived and the autopsy results. The trial

court found it did not find either Defendant or Mrs. Cheeks credible, noting that both

had “recanted their interviews with the police where they admitted wrongdoing

regarding the care of Malachi Golden” and that “Defendant contradicted himself

several times on the stand during his testimony during the trial.” In fact, the trial

court’s finding that Defendant “contradicted himself several times” minimizes the

extreme variations in Defendant’s several conflicting statements to police and his

entirely different trial testimony.

 Given the abundant evidence that Malachi died from starvation, Dr. Privette’s

testimony that Malachi could have died from strangulation as described by Defendant

in his interview with police—which Defendant and Mrs. Cheeks both recanted at

 - 43 -
 STATE V. CHEEKS

 Opinion of the Court

trial—does not negate his initial opinion that Malachi died from starvation. The trial

court specifically found that Defendant’s statements to police about choking Malachi

were not true, and Defendant himself testified at trial they were not true.16 The trial

court determined, quite correctly, that all of the credible evidence supported

starvation as the cause of Malachi’s death. This argument is without merit.

 V. Fatal Variance as to Negligent Child Abuse

 Defendant last argues that the trial court erred by returning a verdict finding

Defendant guilty of negligent child abuse based on a theory not alleged in the

indictment. The indictment alleged that from 1 January 2014 to 11 May 2015, in

violation of North Carolina General Statute § 14-318.4(a4), Defendant

 unlawfully, willfully and feloniously did show reckless
 disregard for human life by committing a grossly negligent
 omission, allowing the child, Malachi Golden, age 4 years
 old, and thus, under 16 years of age, by not providing the
 child with medical treatment in over 1 year, despite the
 child having a disability, and further, not providing the
 child with proper nutrition and medicine resulting in
 weight loss and failure to thrive. The defendant’s omission
 resulted in serious bodily injury, to wit, extreme
 malnutrition and severe dehydration. At the time the
 defendant committed the offense, he was a person
 providing care or supervision of the child.

16 If the trial court had deemed Defendant’s claim of strangulation to be true, Defendant could have
been convicted of child abuse inflicting serious injury (which was based upon inflicting “serious bodily
injury, by placing his hands around Malachi Golden’s throat restricting air and blood flow resulting in
Malachi Golden’s death”), and first degree murder based upon premeditation and deliberation where
a deadly weapon (hands) is used and/or first degree murder in perpetration of a felony. But based
upon its determination that Defendant’s statement regarding strangulation was false, the trial court
found Defendant not guilty of these charges.

 - 44 -
 STATE V. CHEEKS

 Opinion of the Court

 Defendant argues

 that “it is error, generally prejudicial, for the trial judge to
 permit a jury to convict upon a theory not supported by the
 bill of indictment.” State v. Brown, 312 N.C. 237, 248, 321
 S.E.2d 856, 863 (1984). If it is error for the judge to allow
 the jury to convict on a theory not charged in the
 indictment, it necessarily follows that it must be error for
 the judge to do so himself in a bench trial.

 The State argues that Defendant failed to preserve his argument regarding

fatal variance between the indictment and evidence presented at trial by raising it

before the trial court. See State v. Nickens, ___ N.C. App. ___, ___, 821 S.E.2d 864,

874 (2018) (“This Court repeatedly has held a defendant must preserve the right to

appeal a fatal variance. If the fatal variance was not raised in the trial court, this

Court lacks the ability to review that issue.” (citations and brackets omitted)). The

State also argues that “the trial court’s numerous detailed findings and conclusions—

what defendant essentially challenges as a special verdict—are immaterial.

[Defendant] points to nothing to suggest that they were necessary in the first place

let alone that review would be so constricted.”

 We also agree with the State that the “detailed findings and conclusions” were

unnecessary, but since the trial court made the findings, we cannot ignore them and

they are not “immaterial.” Again, this is a case of first impression as a criminal bench

trial which utilized “jury instructions” and includes an order with detailed findings.

Typically, in a bench trial, we can rely upon the assumption that the trial court has

 - 45 -
 STATE V. CHEEKS

 Opinion of the Court

properly applied the law unless the record demonstrates otherwise. See State v.

Williams, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968) (“An appellate court is not

required to, and should not, assume error by the trial judge when none appears on

the record before the appellate court.”). But here, the trial court entered an order and

made a conclusion regarding negligent child abuse:

 7. Defendant committed a grossly wanton negligent
 omission with reckless disregard for the safety of
 Malachi Golden by:

 a. Allowing the child to remain in soiled diapers until
 acute diaper rash formed on the groin and bottom of
 Malachi Golden which included open sores and
 ulcers; and

 b. Keeping the child in a playpen for so long of period
 that bed sores formed on Malachi Golden’s legs and
 knees;

 8. The above sub-paragraphs caused the child extreme pain
 and with reckless disregard for human life.

 Defendant argues we should view this conclusion of law in isolation, but we

must review the entire order and must consider all of the findings of fact which

support this conclusion in context. The trial court also made these findings of fact

relevant to this issue:

 20. Malachi Golden suffered acute diaper rash with extensive
 inflammation on his buttocks and groin.

 21. Some of the ulcers, or wounds, caused by the diaper rash
 were healing while others were open sores that exhibited
 bleeding.

 - 46 -
 STATE V. CHEEKS

 Opinion of the Court

 22. Malachi Golden suffered from the acute diaper rash for an
 extended period without proper treatment.

 23. Staying in soiled diapers for long periods of time caused
 the diaper rash.

 24. Malachi Golden also suffered from bed sores on his legs
 and knees from his lying in the “Pack and Play” for
 extensive periods of time without being moved or given
 proper attention.

 ....

 35. The caregivers ceased Malachi Golden’s medication,
 medical care and therapy sessions at, or near, December of
 2014.

 36. The caregivers ceased all medication, medical care, and
 therapy sessions without consulting Malachi Golden’s
 physicians.

 Again, the parties’ arguments regarding this issue and our review are

complicated by the unusual procedure in this case, as bench trials normally do not

include “jury instructions” or findings of fact. But we review the issue of a fatal

variance de novo, so we will turn to the law first to determine if there was a fatal

variance. See State v. Martinez, 230 N.C. App. 361, 364, 749 S.E.2d 512, 514 (2013).

A fatal variance arises when the allegations of the indictment do not conform to

material aspects of the jury instructions, or, in this case, the law as the trial court

stated it would apply through its “jury instructions” to itself. See State v. Glidewell,

___ N.C. App. ___, ___, 804 S.E.2d 228, 232 (2017). The variance must involve an

 - 47 -
 STATE V. CHEEKS

 Opinion of the Court

essential element of the crime charged, and the defendant must demonstrate

prejudice as a result of the variance:

 When allegations asserted in an indictment fail to “conform
 to the equivalent material aspects of the jury charge,” our
 Supreme Court has held that a fatal variance is created,
 and “the indictment is insufficient to support that resulting
 conviction.” Furthermore, for “a variance to warrant
 reversal, the variance must be material,” meaning it must
 “involve an essential element of the crime charged.” The
 determination of whether a fatal variance exists turns
 upon two policy concerns, namely, (1) insuring “that the
 defendant is able to prepare his defense against the crime
 with which he is charged and (2) protecting the defendant
 from another prosecution for the same incident.” However,
 “a variance does not require reversal unless the defendant
 is prejudiced as a result.”

Id. at ___, 804 S.E.2d at 232 (citations, brackets, and ellipsis omitted).

 We have found no cases addressing whether the allegations of the particular

acts or exact harm caused by the negligent child abuse under North Carolina General

Statute § 14-318(a4) are “essential elements” which must be included in the

indictment or surplusage. But this Court has addressed this issue under North

Carolina General Statute § 14-318(a3), and we see no reason for these two subsections

of this statute to be treated differently. In State v. Qualls, this Court held that the

allegation of the particular injury in the indictment for felonious child abuse under

North Carolina General Statute § 14-318(a3) was surplusage and not grounds for a

fatal variance. 130 N.C. App. 1, 502 S.E.2d 31 (1998) (citation omitted), aff’d, 350

N.C. 56, 510 S.E.2d 376 (1999). In Qualls, the indictment alleged defendant had

 - 48 -
 STATE V. CHEEKS

 Opinion of the Court

inflicted serious physical injury on 15 March 1993 by: “blunt trauma to the head

resulting in a subdural hematoma to the brain,” but the evidence at trial showed that

the “victim suffered an epidural hematoma on 15 March 1993 and a subdural

hematoma on or about 26 March 1993.” Id. at 7, 502 S.E.2d at 36 (brackets and

emphasis omitted). This Court held there was no fatal variance:

 All that is required to indict a defendant for
 felonious child abuse is an allegation that the defendant
 was the parent or guardian of the victim, a child under the
 age of 16, and that the defendant intentionally inflicted any
 serious injury upon the child. Here, the indictment
 appropriately charged the elements of that crime;
 therefore, the reference to the victim suffering a subdural
 hematoma rather than an epidural hematoma was
 surplusage and was properly disregarded by the trial court.
 As such, the trial court did not err by denying defendant’s
 motion to dismiss on that basis.

Id. at 8, 502 S.E.2d at 36 (citation and emphasis omitted).

 North Carolina General Statute § 14-318(a4) provides as follows:

 A parent or any other person providing care to or
 supervision of a child less than 16 years of age whose
 willful act or grossly negligent omission in the care of the
 child shows a reckless disregard for human life is guilty of
 a Class E felony if the act or omission results in serious
 bodily injury to the child.

N.C. Gen. Stat. § 14-318.4(a4) (2017). Thus, the essential elements of an indictment

for negligent child abuse inflicting serious bodily injury are: (1) the defendant was “a

parent or any other person providing care to or supervision”; (2) “of a child less than

16 years of age”; (3) the defendant commits a “willful act or grossly negligent omission

 - 49 -
 STATE V. CHEEKS

 Opinion of the Court

in the care of the child”; (4) showing “a reckless disregard for human life;” and, (5)

“the act or omission results in serious bodily injury to the child[.]” Id.

 The indictment here includes each of these elements, and the additional

statements regarding failure to provide medical care, failure to provide nutrition and

hydration, extreme malnutrition, and severe dehydration are surplusage. The

allegations are “beyond the essential elements of the crime sought to be charged[,

and they] are irrelevant and may be treated as surplusage.” State v. Lark, 198 N.C.

App. 82, 90, 678 S.E.2d 693, 699-700 (2009) (quoting State v. Westbrooks, 345 N.C.

43, 57, 478 S.E.2d 483, 492 (1996)).

 We also note that a defendant must show prejudice arising from an alleged

fatal variance. Defendant here failed to make any argument he was unable to

prepare his defense or of any prejudice whatsoever from this alleged fatal variance

Further, the evidence showed that Malachi needed medical care for many reasons,

but the trial court’s findings and conclusions regarding Malachi’s acute diaper rash

and bed sores are consistent with the scope of the evidence as discussed in the charge

conference regarding the jury instruction on negligent child abuse. The State noted

that it was “talking about a variety of things. It includes not providing the child with

medical treatment in over one year despite having a disability, not providing the child

with proper nutrition, medicine resulting in weight loss and failure to thrive. So

basically, includes nutrition aspect of it, the medicine, and the medical treatment.”

 - 50 -
 STATE V. CHEEKS

 Opinion of the Court

Defendant had no objection to the “jury instruction” as to negligent child abuse as

encompassing “a variety of things” including failure to provide medical treatment.

 As found by the trial court and as supported by the testimony of several

witnesses, this was not a case of garden variety diaper rash. The extreme diaper rash

and pressure sores were serious and painful conditions requiring medical treatment,

but Defendant and Mrs. Cheeks failed to obtain any medical treatment for these

conditions. Mrs. Cheeks testified that they failed to provide Malachi with any

medical treatment whatsoever after 31 October, 2013, the day before she and

Defendant got married. She testified that he never again saw his pediatric

neurologist, got a wellness check, got an immunization, or went to a pediatrician after

this date, although she did regularly take her other two children to the doctor. This

argument is overruled.

 VI. Conclusion

 The evidence was sufficient to support first degree murder by starving and

negligent child abuse, so the trial court properly denied Defendant’s motion to

dismiss. There was no fatal variance between the evidence presented and the

indictment for negligent child abuse because the additional allegations of the

indictment were surplusage, not necessary for the indictment, and Defendant failed

to argue any prejudice from the alleged variance. The trial court’s findings of fact

 - 51 -
 STATE V. CHEEKS

 Opinion of the Court

support its conclusions of law regarding both first degree murder by starving and

negligent child abuse. Defendant received a fair trial free from prejudicial error.

 NO ERROR.

 Judges BRYANT and COLLINS concur.

 - 52 -